329 S.E.2d 860

**STATE of West Virginia**

v.

**Joey HALL.**

**Joey HALL**

v.

**W. Joseph McCOY, Commissioner, etc.**

Nos. 16377, 16509.

Supreme Court of Appeals of
West Virginia.

April 18, 1985.

Preiser & Wilson, Barbara H. Fleisher, Charleston, for appellant Hall.

Paul R. Goode, Pros. Atty., Pineville, for appellee State.

MILLER, Justice:

We have consolidated Joey Hall's second appeal from a first degree murder conviction in the Circuit Court of Wyoming County with his petition for a writ of habeas corpus also challenging that conviction. Both involve the question of whether his conviction must be reversed as a result of the State's failure to disclose exculpatory evidence. For the reasons which follow, we find that a new trial is warranted.

On Hall's first appeal, we remanded the case to the circuit court for a determination of whether his conviction for first degree murder should be reversed because the defense was not provided information concerning the prior criminal record of Russell Howard Green, Jr., the State's chief witness and only eyewitness to the crime.[1] *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43, 47–48 (1983).

Following a hearing on remand, the circuit court found that defense counsel had not specifically requested Green's criminal record prior to trial and that the State had not "concealed" the record, but simply did not have Green's criminal record *in its file* when the complete file of the case was made available to defense counsel.

The circuit court further found that the jury's verdict would not have been affected by the disclosure of the witness's "rap sheet," showing two misdemeanor convictions, because the jury knew from the evidence at trial that Green was involved in drug trafficking. The circuit court therefore affirmed his conviction.

After we agreed to hear Hall's appeal from the circuit court's decision on remand,

Hall advised his appellate counsel that about two days after his murder conviction Trooper G.R. Johnson of the Department of Public Safety played for him a tape recording of an interview with Green. In this taped interview, Green stated that Hall shot the victim five times from inside a car and that the car window on the driver's side must have been broken from the inside by a shot passing through the victim's head.

Green testified at trial that Hall fired three shots inside the car, exited the car on the passenger's side, walked around to the driver's side and fired two more shots through the driver's side window.

Hall's counsel began an investigation to obtain the missing tape recording and by way of writ of habeas corpus filed in this Court developed these facts. Hall's former attorneys confirmed that Hall had mentioned hearing the tape after the trial sometime during the pendency of the original appeal. Trooper Johnson was deposed and also admitted playing a tape recording to Hall of an interview with Green shortly after his conviction in May, 1982. The grand jury testimony of Trooper Johnson and statements of the prosecutor before the grand jury indicate the prosecution may have been aware of the tape.

After oral argument had been completed in this Court, the tape recording was located by Trooper Johnson on January 25, 1985. He turned it over to Hall's counsel who promptly submitted it to our Clerk for our consideration.[2] This recording stands

---

1. The correct spelling of the witness's last name is unclear. In the text of this opinion we have used the spelling as it appears in the trial record, but his name is consistently spelled with an extra "e," i.e., Greene, in the reports concerning his criminal record.

2. The following is a partial transcript of the May 4, 1981 tape recording of Green, which is inaudible in places:

"Note: the questions are asked variously by Trooper Johnson and Corporal DeQuasi.
Q: Okay, now, when you parked, whereabouts did you park at, Rusty?
A: Behind him.
Q: You parked behind him. Right?
A: Uh huh.

Q: Okay. Um, if you parked behind him, was there any shots fired from outside the car besides the one in the plate? How about the window?
A: No. All the shooting had to be done on the inside, cause Joey didn't jump out and start shooting through a window, you know what I mean?
Q: How about the drivers [sic] window? How'd it get broken?
A: Uh, [PAUSE], Buddy, I guess the bullet goes through your head, uh, I couldn't tell you, I couldn't tell you. I couldn't tell you that. There is something that I can't tell you. Okay?
. . . .
Q: If he—

in sharp contrast with the critically important portions of Green's trial testimony.[3]

It is clear that Hall specifically requested Green's prior statements and that the taped statement was not provided to him. The question is whether the government's failure to disclose to the defense favorable information which was specifically requested amounts to a violation of due process vitiating Hall's conviction.

We begin our analysis with a brief summary of the controlling authorities. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecutor in that case failed to disclose an accomplice's confession thereby denying the accused favorable evidence.

We applied *Brady's* principles in *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973), and stated in Syllabus Point 4 that: "A prosecution that withholds evidence on the demand of an accused, which, if made available would tend to exculpate him, violates due process of law."

More recently in *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402, 409–11 (1982), we reviewed our decisions discussing a prosecutor's constitutionally mandated duty to disclose exculpatory evidence and held that under our Constitution disclosure of such evidence is required, even in the absence of a specific request. In Syllabus Point 4, we stated:

"A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution."

Our holding in *Hatfield* was based, in part, on *United States v. Agurs*, 427 U.S. 97, 96

---

A: He did not do no firing. He only fired one shot from outside that car. He sure did. He sure did. And that was the one into the trunk.

Q: Did you see him fire that one?

A: Yeah, I seen that shot. On account—I was getting the hell down the road, you know what I mean?

Q: Okay. What do you think—INAUDIBLE

A: —and I'm turning around—I don't know. He went and got—He told me, he said, 'Look,'—words, the exact words he said to me, he said 'Hey, nobody knows about this but me and you.' He said, 'If it ever comes out' he said 'you're the one that told.' And that's when I was trying—I was turning then, see—getting the hell out of there. So what he done at the end, I couldn't tell you that. I really couldn't tell you.

. . . .

Johnson: Ah. You all come on back in here for a second, okay.

?: Okay.

A: Okay, I know what the guy's gonna say. It's going to be so hard to prove this on him—it's going to be almost impossible.

Johnson: Well, I'm gonna have to pick your brain and then go down there and find some more . . .

DeQuasi: You don't have to but it'd be of benefit for them to find out where he stayed . . .

A: Okay, I've been telling you one thing wrong here. Okay. You want to know how that window got busted out? Yeah, he walked

around the side of that car. I guess that's the reason that—[Pause]

Johnson: What did he break the window out with?

A: That thing shot through it. I guess the guy must have moved or something for all know, I mean . . . ah, like I say, I'm getting everything straight, I don't want nothing coming back on me on this—not the first damn thing.

DeQuasi: [INAUDIBLE] I'll be in here.

A: I know it sounds like I've changed my story 40 different Goddamn times here, Buddy, I'm just trying to get 'er straight [CHAIR SCRAPING] I am not gonna take the blame for this."

3. The important portions of Green's trial testimony follow:

"Q. You said you heard three quick shots, then two later?

A. Yes, Sir.

Q. Did you see Mr. Hall fire two other shots other than the one in the back of the car?

A. Into the side, looked like the side window. This was on the driver's side.

Q. On the driver's side?

A. Yes, sir.

Q. In other words, as far as you can recall, three inside, two outside, driver's side, and the sixth shot into the trunk?

A. Yes, sir, but you got to realize now I thought the boy was going to shoot me. I was scared to death, and I was ready to run."

S.Ct. 2392, 49 L.Ed.2d 342 (1976).[4]

■ We emphasized in Hall's first appeal that Green's credibility was the most important issue in the case, that his testimony carried many indicia of unreliability, and that a reasonable doubt "might well have been created by even insubstantial additional impeachment" of Green. 172 W.Va. at 143, 304 S.E.2d at 48.[5] Viewing the record as a whole, we conclude that the jury's verdict might have been different had the jury been allowed to hear Green's prior inconsistent statement. In other words, a reasonable doubt might well have been created.

■ Although the prosecution argues that he had an open file policy, this policy does not excuse his failure to disclose the tape recording. Even if the prosecution was unaware of the tape's existence, which seems quite unlikely considering all the circumstances, what Trooper Johnson knew must be imputed to the prosecution. He was a part of the prosecution. It is not enough for the prosecution to simply say that he provided the defense all evidence he chose to put in the file. As we discussed at some length in *State v. Watson*, 173 W.Va. 553, 318 S.E.2d 603, 609 (1984), "a prosecutor is required to disclose statements to which he has access even though he does not have the present physical possession of the statements." [6]

■ Since the initial trial, Green has died. This does not, of course, foreclose the State from retrying Hall. As we pointed out in *Angel v. Mohn*, 162 W.Va. 795, 799–80, 253 S.E.2d 63, 66 (1979), the State can introduce Green's trial testimony, a practice sanctioned under *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Mattox v. United States*, 156 U.S. 237, 39 L.Ed. 409, 15 S.Ct. 337 (1895). *See also State v. Dawson*, 129 W.Va. 279, 40 S.E.2d 306 (1946); West Virginia Rules of Evidence, Rule 804(b)(1).

■ The more interesting question is the defendant's right to use the inconsistent tape which was discovered after the first trial. Impeachment of a witness can occur by several methods. One is through cross-examination on a prior inconsistent statement. *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981); *State v. Daggett*, 167 W.Va. 411, 280 S.E.2d 545 (1981); F. Cleckley, Handbook on Evidence § 21B (1977). Another technique is to offer a witness whose testimony is inconsistent with the first witness's. *See State v. Atkins*, 163 W.Va. 502, 518–19, 261 S.E.2d 55, 63 (1979); *State v. Ramey*, 158 W.Va. 541, 552, 212 S.E.2d 737, 745 (1975), *overruled on other grounds, State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977); F. Cleckley, *supra* ·at § 21A(1)(a). Obviously, cross-examination of Green as to the inconsistent statement is unavailing. Officer Johnson who took the taped statement of Green is available.

It appears to be generally recognized that where a deceased witness's testimony is introduced at trial through his prior trial testimony or by way of deposition, then

---

4. In *Agurs*, 427 U.S. at 112–13, 96 S.Ct. at 2402, 49 L.Ed.2d at 355, the United States Supreme Court stated:

   "It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." (Footnote omitted).

5. At the original trial, Hall produced eight alibi witnesses who placed him in Tampa, Florida,

during the entire week that the shooting took place.

6. *Watson* dealt with disclosure under Rule 26.2 of the Rules of Criminal Procedure. However, the federal courts have utilized the same standard for disclosure of exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *E.g., Wedra v. Thomas*, 671 F.2d 713 (2d Cir.1982), *citing, United States v. Morrell*, 524 F.2d 550, 554 (2d Cir. 1975); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir.1964); *United States v. Deutcsh*, 475 F.2d 55 (5th Cir.1973); *see* Bass, *Brady v. Maryland and the Prosecutor's Duty to Disclose*, 40 U.Chi.L.Rev. 112, 125 (1973); Annot., 34 A.L.R.3d 16 (1970).

such testimony may also be impeached through that witness's prior inconsistent statement, as pointed out in *State v. Fredette*, 462 A.2d 17, 26 (Me.1983): "As a general principle, an absentee witness whose testimony is admitted in the form of prior testimony, may be impeached in the same manner as if the witness were present and testifying. *See* 3A.J. Wigmore, [Evidence] § 888, at 652 [(Chadbourn rev. 1924)]."

One of the leading cases in this area is *People v. Collup*, 27 Cal.2d 829, 167 P.2d 714 (1946), where a State's witness's testimony taken at a preliminary hearing was read at trial. It was held error to exclude evidence of a subsequent inconsistent statement of that witness. *See also People v. Redston*, 139 Cal.App.2d 485, 293 P.2d 880 (1956); *State v. Yingst*, 651 S.W.2d 641 (Mo.Ct.App.1983); *State v. Kline*, 11 Ohio App.3d 208, 464 N.E.2d 159 (1983); McCormick on Evidence 73 (3d ed. 1972). We have dealt with a related question in *State v. Young*, 166 W.Va. 309, 273 S.E.2d 592, 602 (1980), where we indicated in note 7 that a person's dying declaration introduced at trial could be impeached. F. Cleckley, *supra*, § 63.

▪ This area is now more developed in this State as a result of our adoption of Rule 806 of the Rules of Evidence, which is identical to the Federal Rule 806. This rule, in essence, states that as to any hearsay statement which is admitted in evidence, "the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness."[7] The language of the rule makes it clear that "a statement or conduct by the declarant at any time, inconsistent with his hearsay statement" is not subject to the traditional requirement of affording the declarant an opportunity to explain or deny the inconsistency.[8]

▪ There is no doubt but that on a retrial Green's prior trial testimony is admissible as an exception to the hearsay rule under Rule 804(b)(1)[9] of the West Virginia Rules of Evidence. Therefore, impeachment by reason of his inconsistent statement is available under Rule 806.

This issue was more fully developed on the habeas corpus, rather than on the appeal which was limited by our earlier remand in *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983). Consequently, we grant the writ of habeas corpus and dismiss the appeal.

No. 16377—Appeal Dismissed.

No. 16509—Writ Granted.

---

7. The West Virginia Rules of Evidence became effective February 1, 1985. The text of Rule 806 is:

"When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E) has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination."

8. In effect, Rule 806 abolishes the foundation requirement for impeachment of an admitted hearsay statement. *See* 4 J. Weinstein & M. Berger, Weinstein's Evidence § 806(01) (1984).

9. Rule 804(b)(1) states:

"*Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."