424 S.E.2d 725

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Phillip A. WARD, Defendant Below, Appellant.**

**No. 19797.**

Supreme Court of Appeals of West Virginia.

Submitted May 15, 1991.

Decided July 29, 1991.

Teresa A. Tarr, Asst. Atty. Gen., for appellee State of W.Va.

Frank W. Helvey, Jr., Public Defender, Charleston, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Phillip A. Ward from the February 25, 1988, final order of the Circuit Court of Cabell County sentencing the defendant to life imprisonment without parole based upon his October 20, 1987, jury convictions of one count of murder in the first degree without a recommendation of mercy and one count of aggravated robbery.[1] The appellant alleges that the following errors were committed at the lower court

---

1. The appellant was only sentenced on the first degree murder count, since the aggravated robbery count served as the underlying felony in the state's felony-murder prosecution.

level: 1) the trial court committed reversible error by its refusal to permit the defendant's rebuttal witness to testify; 2) the defendant was denied a fair trial because the state failed to disclose exculpatory evidence to him; and 3) the jury voir dire by the trial court, with defense counsel's acquiescence, was so deficient as to have denied the defendant a trial by an impartial jury. Upon a review of the record, the petition, the briefs and oral arguments and all other matters of record, we find no error was committed by the lower court and accordingly affirm.

On May 3, 1987, the victim, Carol Carter, was last seen alive at her place of employment, a Wendy's restaurant in Huntington, West Virginia, where she was the night manager. According to the testimony of Craig Sigler who was also an employee at Wendy's, he got off work around 8:00 p.m. on May 3. He later returned to the restaurant around 11:30 p.m. to see when the defendant, who was also an employee at Wendy's was getting off from work.[2] At this time, the defendant left Wendy's with Sigler to go to Tradewell Supermarket so that Sigler could meet a girl. They returned to the restaurant approximately ten minutes later. The victim remained at Wendy's to finish some paper work.

Sigler testified that when he and the defendant returned to the restaurant, the victim let them back inside. Once inside, both Sigler and the defendant made some phone calls from the phone in the restaurant kitchen. The phone calls, according to Sigler, were placed at around 12:15 a.m. The two men then proceeded with the victim into the restaurant dining area where they proceeded to engage in conversation.

The threesome decided to leave the restaurant, and according to Sigler, they got as far as the parking lot when the victim went back inside the restaurant. Sigler testified that he got into his car and drove away. Sigler also testified that the appellant was by his car preparing to get in when he drove away. While Sigler was uncertain as to what time he left the restaurant, he did testify that he arrived at his home around 12:37 a.m. The witness stated that it takes approximately five or six minutes to drive from Wendy's to his home.

On May 4, 1987, the store manager, Danny O'Brien, arrived at Wendy's before 5:45 a.m. He testified that upon his arrival, he saw the victim's car still on the parking lot. Upon closer inspection, O'Brien also noticed the victim's keys and contact lens case lying on the sidewalk just outside the restaurant's unlocked front entrance. O'Brien then notified the Cabell County Sheriff's Department. When a deputy arrived at the scene, both he and O'Brien went into the store following a path of blood which led to the kitchen. The two men also went into the office area where, according to O'Brien's testimony, approximately $1,348.09 was missing.

Shortly thereafter, other deputies who had arrived at the scene discovered Carter's partially clad body behind an adjacent furniture store. The medical examiner, Dr. Irvin M. Sopher, testified that the cause of the victim's death was multiple blows to the head resulting from a cinderblock which was found near the crime scene. Dr. Sopher also testified that the victim's death occurred between midnight and 2:00 a.m. on May 4, 1987.

Further evidence offered at trial revealed that the defendant was an inmate[3] at the Huntington Work Release Center[4] (hereinafter referred to as HWRC), and had worked at Wendy's for about a year. In September 1986, the Department of Corrections had authorized him to live at his mother's home in Huntington, subject to reporting and curfew restrictions. Accord-

---

2. The store manager, Danny O'Brien, testified that both the appellant and the victim punched out at 11:37 p.m.

3. The fact that the appellant was an inmate at the Huntington Work Release Center did come in at trial without objection. However, the lower court did not permit the underlying felonies which created the appellant's inmate status to be admitted at trial.

4. The appellant was assigned to the HWRC in January 1986. He was serving concurrent sentences of one to ten years for grand larceny and one to five years for unlawful wounding.

ing to the testimony of Andrea Hefner, the defendant's girlfriend, both she and the defendant moved out of the defendant's mother's home in late February 1987, without notifying the HWRC. However, at the time of Carter's death, Hefner testified that the two were again staying at the defendant's mother's home, because electric service had been disconnected at their apartment on May 1, 1987, due to nonpayment of the electric bill.

No one was able to testify as to what time the defendant arrived back at his mother's home after he got off from work on May 4, 1987. Although Hefner did testify that while she went to sleep around 11:30 p.m. the previous night and did not know when the defendant arrived at home, she did see his car parked out in front of the house when she looked out the window sometime between 2:00 a.m. and 3:00 a.m. in the morning. She indicated that she did not see the defendant until 9:00 a.m. when he awakened her and told her that he had just returned home after having earlier that morning been called back to work.

The evidence revealed that prior to May 4, 1987, the defendant and his girlfriend had no money, yet on that day not only did the defendant's girlfriend have $200.67[5] to pay the overdue electric bill, but also the defendant had $271.00 with which to purchase and have installed a new car stereo at the Pied Piper in Huntington.[6] Further, the police obtained Appalachian Power Company's night cash deposit and examined the currency therein only to discover a bloodstained $20.00 bill. The evidence at trial revealed that the bloodstains discovered on the bill had the same characteristics as the victim's blood. The state's expert in serology testified that the victim's ABO blood type and blood characteristics were consistent with a bloodstain found on a five

dollar bill retrieved from the defendant's wallet upon his arrest and with a bloodstain on a one dollar bill which was in a knapsack found in the defendant's neighbor's water-filled trash barrel.[7] There were no bloodstains found on the Pied Piper money. Moreover, the expert testified that only .09 percent of West Virginia's general population had the same blood characteristics as the victim.

Finally, the state offered evidence of the defendant's flight. At approximately 6:40 a.m. on the morning of May 4, HWRC Deputy Administrator Karen Spoor saw the defendant at a gas station in Huntington. She testified that she questioned the defendant as to why he was not at home. The defendant told Spoor that he had been called back to work. Spoor's testimony indicated that she told the defendant that she had noticed crime scene tape and police cars at Wendy's. She then directed the defendant to contact the HWRC as soon as he finished at work. The defendant, however, did not contact the HWRC until about 3:55 p.m. Spoor testified that she took his phone call and kept him on the line while Administrator Linda Hawkins went to his mother's home, where the defendant was located when he called.

Hawkins testified that upon her arrival, she spoke with the defendant for a short while about his failure to obey Spoor's instructions. During a break in their conversation, she testified that the defendant excused himself to go upstairs to the bathroom. After a few minutes, she learned that he had fled the house on foot through a second story window. Spoor testified that corrections officials then began to search for the defendant and apprehended him approximately fifteen to twenty minutes later walking briskfully approximately two blocks from his mother's home. When

---

**5.** The evidence at trial did reflect that on May 4, Hefner, at a local bank, cashed a $150.00 check from her grandmother and a $75.00 money order she received from her mother.

**6.** The cashier at the Pied Piper testified that the defendant paid for the merchandise in cash using bills of small denominations.

**7.** The knapsack contained books and papers which had the defendant's name on them. Also

found within the knapsack was a paperbox containing thirty-five $1.00 bills; a statue with twenty-seven $20.00 bills and two $100.00 bills stuffed inside; and, a pillow case containing both rolled and loose coins. Further, Hefner testified that the statue which was found in the knapsack belonged to her and that she did not keep money in it.

Hawkins asked the defendant why he had fled, he replied "I was afraid."

The defendant did not testify at trial; however, his defense centered upon his denial in committing the crime. At the conclusion of presentation of all the evidence in the case, the jury, after deliberation, found the defendant guilty of one count of murder in the first degree and one count of aggravated robbery.

## I.

The first issue raised by the defendant is a matter of first impression for this Court and involves whether the trial court committed reversible error by its refusal to permit the defendant's rebuttal witness to testify. The defendant contends that whether the trial court's exclusion of the defendant's rebuttal witness was based on defense counsel's failure to timely disclose the witness' name to the state as required by the West Virginia Rules of Criminal Procedure, the witness violating the court's sequestration of witnesses order, or both, the sanction imposed by the trial court was too severe, exceeded the legitimate discretion of the court, and violated the compulsory clause of the defendant's sixth amendment right.[8]

It is important at the outset to understand the facts relating to this issue. Prior to opening arguments, the lower court did announce from the bench that "[a]nyone here who is here under subpoena[9] as a witness please remove yourself from the courtroom at this time." The lower court then reiterated a similar order prior to the commencement of the second day of trial.

During the direct examination of defendant's girlfriend, Andrea Hefner, the state attempted to ascertain how the defendant suddenly came into enough money not only to pay off the overdue electric bill, but also to purchase a new car stereo. The witness indicated that the defendant possibly borrowed money in order to purchase the car stereo. Further, during cross-examination of Hefner, she indicated that the defendant often went to the store where the stereo was purchased with his uncle. Thus, the implication was made that maybe the defendant's uncle helped with the purchase of the car stereo. At this time, defense counsel still had given no indication to the state that he planned to call the uncle as a witness in the case.

The defense counsel reserved his opening statement to the jury until the close of the prosecution's case-in-chief. During the opening statement, made on the last day of trial, the defense stated that

> You will also hear the testimony of Mr. Johnson who is related to Mr. Ward, and he will tell that [sic] you on April the 27th of 1987, he gave Mr. Ward a sum of cash, about $300.00 in money, and that money was paid to him in denominations of fives and tens and twenties. Mr. Johnson will tell you that although he's disabled, he is self-employed on a part-time basis salvaging used automobile parts, and that Mr. Ward has often made himself available for Mr. Johnson's assistance in his part-time business, and that Mr. Johnson paid Mr. Ward the money when he got it, and that one of those occasions just happened to be April 27th of 1987.

Prior to the defendant calling Mr. Johnson, the defendant's uncle, the state objected to the defense counsel's failure to notify the state of the defendant's intention to call Mr. Johnson. Further, the state claimed that Johnson was in the courtroom in violation of the court's sequestration order.

The lower court then conducted an in camera hearing based upon the state's alle-

---

**8.** The sixth amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...."; *see* article III, § 14 of the West Virginia Constitution which provides, in pertinent part, that "[i]n all such [criminal] trials ... there shall be awarded to him [the accused] compulsory process of obtaining witnesses in his favor."

**9.** Defendant places much import on the fact that the witness in question was *not* a subpoenaed witness, but it is quite clear that the sequestration order applied to all witnesses or potential witnesses and it is further clear that everyone involved knew this to be the case.

gation. The defendant's witness, Johnson, testified at this in camera hearing that he was in the courtroom during the prosecution's opening statement [10] and also during portions of the defendant's girlfriend's testimony which occurred the second day of trial. Johnson indicated that he left the courtroom after arriving on the next to last day of trial shortly after going into the courtroom, when "Phillip's sister told me I'm supposed to be outside."

The defendant's attorney, when questioned about the presence of Johnson in the courtroom in violation of the sequestration order, indicated that as soon as he was informed of his presence in the courtroom he immediately told Johnson to leave.

At the conclusion of the in camera hearing the trial court made the following ruling:

> Mr. Stolze [the defense attorney], as I've ruled before, you've known about him for three months by your own representation. You did not list him as a possible witness. If you had, he certainly would have been sequestered along with the other witnesses. It's clear that he heard the testimony of Andrea Hefner by his own admission, and in that testimony that you attempted to establish that he borrowed money from apparently this man, his uncle, in order to pay that Pied Piper bill. And in addition, he heard the prosecuting attorney's opening statement which indicated their theory of the case was that he paid cash the next day or the day of the robbery for the Pied Piper equipment, and additionally, he was here for part of the testimony. In light of that, I do feel that he must be excluded.

## A. FAILURE TO DISCLOSE WITNESS TO STATE

First, with regard to the failure to disclose the witness to the state, the defense counsel indicated that he had known about Johnson for at least three months when the

defendant told counsel that Johnson had allegedly loaned money to him. However, the defense counsel indicated that he had not anticipated using Johnson as a witness because the forensic reports concerning the cash recovered from the Pied Piper indicated that no blood was discovered on any of that money. However, it is clear that the state did fully disclose forensic reports to the defendant and there was no surprise at trial concerning the information contained in the forensic reports. Thus, defense counsel's non-disclosure lacked logic. The purpose of the witness' testimony was to explain how the defendant came into the money, not how bloodstains could have gotten on it.

West Virginia Rules of Criminal Procedure 16(b)(1)(C) & 16(c) provides:

> (C) Defense Witnesses.—If the defendant requests disclosure under subdivision (a)(1)(E) of this rule, upon compliance with such request by the State, the defendant, on the request of the state, shall furnish the state with a list of the names and addresses of the witnesses he intends to call in the presentation of the case in chief. When a request for discovery of the names and addresses of witnesses has been made by the State, the defendant may be allowed to perpetuate the testimony of such witnesses in accordance with the provisions of Rule 15.
>
> . . . .
>
> (c) Continuing Duty to Disclose. If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional evidence or material.

Further, West Virginia Rule of Criminal Procedure 16(d)(2) provides that

> (2) Failure to Comply with a Request.—If at any time during the course of the proceedings it is brought to the

---

**10.** Contained within the prosecution's opening statement was the portion of the state's theory of the case as to the defendant having no money to pay an overdue electric bill the day before the robbery/murder; yet the day after the crime, having enough money to buy a new car stereo system.

attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

This Court has addressed the application of West Virginia Rule of Criminal Procedure 16 as it pertains to the state's failure to identify potential witnesses as requested by the defendant. *See State v. Weaver,* 181 W.Va. 274, 382 S.E.2d 327 (1989); *State v. Johnson,* 179 W.Va. 619, 371 S.E.2d 340 (1988); *see also State v. Miller,* 178 W.Va. 618, 363 S.E.2d 504 (1987). We found that in the context of nondisclosure of state's witnesses to the defense, "[t]he nondisclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case." Syl.Pt 1, in part, *Johnson,* 179 W.Va. at 621, 371 S.E.2d at 342.

The United States Supreme Court in *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), however, was presented with facts analogous to the present case. In *Taylor,* the petitioner, who was on trial for attempted murder, failed to disclose to the state a witness who, the defense contended, had probably seen the " 'entire incident.' " *Id.* at 403, 108 S.Ct. at 650. The petitioner, after the prosecution had put on its two principal witnesses, attempted to amend the discovery answer to include this witness.[11] *Id.*

As a sanction for the defense counsel's failure to identify the witness in violation of the discovery request, the trial court refused to let the witness testify. *Id.* at 405, 108 S.Ct. at 651. Further, the lower court found that the defense counsel's failure to comply with discovery was a willful and blatant violation of the rules. *Id.*

The Supreme Court analyzed whether the lower court's decision violated the petitioner's sixth amendment right to compulsory process. The petitioner claimed that the sixth amendment prohibits a court from ever ordering the preclusion of defense evidence as a sanction for violating a discovery request. *Id.* at 406, 108 S.Ct. at 651.

The Supreme Court recognized that "[t]he right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact." *Id.* at 409, 108 S.Ct. at 653. The Court, however, went on to hold that while

[i]t is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor, ... the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

*Id.* at 414–15, 108 S.Ct. at 655–56 (footnotes omitted); *see also United States v. Nobles,*

---

**11.** A voir dire examination was conducted in which the witness testified that while he was not a witness to the incident, he had seen the victim prior to the shooting. The victim and his brother were carrying guns and threatening the petitioner. The witness also testified that he had warned the petitioner about the victim's conduct. *Taylor,* 484 U.S. at 404–05, 108 S.Ct. at 650–51.

422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (Supreme Court held defendant has duty to disclose portions of investigator's report pursuant to Rule 16 where report was to be used for impeachment purposes).

Finally, the Court in *Taylor* found no merit to petitioner's claims that the trial court's sanction was too harsh or that punishment for the sin of his attorney's failure to include the witness' name in the discovery request should not be cast upon him. 484 U.S. at 416, 108 S.Ct. at 656. The Court indicated that the claim that the client should not be held accountable for his lawyer's misconduct "strikes at the heart of the attorney-client relationship." *Id.* at 417, 108 S.Ct. at 657. Further,

> [t]he adversary process could not function effectively if every tactical decision required client approval. Moreover, given the protections afforded by the attorney-client privilege and the fact that extreme cases may involve unscrupulous conduct by both the client and the lawyer, it would be highly impracticable to require an investigation into their relative responsibilities before applying the sanction of preclusion. In responding to discovery, the client has a duty to be candid and forthcoming with the lawyer, and when the lawyer responds, he or she speaks for the client. Putting to one side the exceptional cases in which counsel is ineffective,[12] the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial.

*Id.* at 418, 108 S.Ct. at 658.

■ Thus in following the United States Supreme Court in *Taylor*, we hold that where a trial court is presented with a defendant's failure to disclose the identity of witnesses in compliance with West Virginia Rule of Criminal Procedure 16, the trial court must inquire into the reasons for the defendant's failure to comply with the discovery request. If the explanation offered indicates that the omission of the witness' identity was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it is consistent with the purposes of the compulsory process clause of the sixth amendment to the United States Constitution and article III, § 14 of the West Virginia Constitution to preclude the witness from testifying.

■ In the present case, it is evident from the in camera hearing concerning this matter that at least three months prior to trial, the defendant's attorney knew about the witness, the contents of his testimony, and the strong potential that he would be called to testify. Moreover, the defendant's attorney indicated during questioning by the lower court that it became apparent to him on the second day of trial that the witness' testimony would be needed,[13] yet defense counsel *still* failed to identify the witness to the state. Had the defense counsel only failed to disclose the identity of the witness to the state, it may have been possible for the lower court to have given the state a continuance to prepare for cross-examination of the witness and therefore, the trial court may not have been forced into the ultimate sanction of preclusion of the witness' testimony. However, defense counsel also failed to remove

---

**12.** In the present case, we leave unresolved the issue of whether there was ineffective assistance of counsel. The record contains insufficient information to make such a determination on appeal and is better left addressed in a petition for habeas corpus.

**13.** The defense counsel stated to the trial court after the state's objection to the witness being called that:

> Your honor, at this time I would move that the witness be allowed to testify. The reason his testimony is being proffered is because there was some surprise to myself last Friday of the testimony of the young lady who appeared from the Pied Piper and testified about the cash payment being made by the defendant, in particular with respect to the denominations of the bills.

However, there is no indication in the record that this information in any way surprised the defendant since he knew about the witness before trial and never objected when the information was revealed during trial.

the witness from the courtroom until the final day of trial in violation of the court's sequestration order.

Generally, we would hesitate to uphold the exclusion of a defense witness who could offer evidence in a defendant's behalf on the basis of nondisclosure alone. But what moves this case into the posture of justifying such exclusion is the nondisclosure coupled with violation of the sequestration order.

## B. SEQUESTRATION ORDER

Perhaps the more significant basis for the preclusion of testimony by this witness was the fact that the court's sequestration order was also violated. It is undisputed that either party has the right to request the trial court to exclude witnesses from the courtroom in order to prevent them from hearing the testimony of other witnesses. *See* W.Va.R.Evid. 615. Additionally, this Court has previously held that " '[w]here a sequestered witness does not withdraw when ordered, or afterwards returns into the courtroom and is present during the examination of other witnesses, it is discretionary with the judge whether or not he will allow this witness to be examined.' " Syl.Pt. 3, *State v. Steele*, 178 W.Va. 330, 359 S.E.2d 558 (1987) (quoting Syl.Pt. 7, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974)); *see State v. Banjoman*, 178 W.Va. 311, 315–16, 359 S.E.2d 331, 335–36 (1987).

In *Steele*, the defendant alleged that the trial court committed error in permitting a state witness to testify. The witness had heard a tape recording of in-court testimony of two state witnesses made by a courtroom observer and played by the observer outside of court. 178 W.Va. at 333–34, 359 S.E.2d at 561–62. The defendant argued that the witness violated the sequestration order.

We indicated that the general rule to be applied in these matters is that "where a State witness violates a sequestration order and is permitted to testify, the question on appeal is whether the witness's violation of the order and the ensuing testimony had a prejudicial effect on the defendant's case."

*Id.* at 335, 359 S.E.2d at 563. We then concluded that since the witness' testimony was totally unrelated to the taped-recorded testimony heard by the witness, there was no prejudice to the defendant. *Id.*

Further, in *Fendler v. Goldsmith*, 728 F.2d 1181, 1186 (9th Cir.1984), the Ninth Circuit Court of Appeals, despite reaching a conclusion opposite to the instant case, indicated that

In those cases where preclusion of testimony by defense witnesses is permitted, it is usually because the integrity of the evidence involved has been threatened. In cases involving defense violations of witnesses sequestration orders, for example, courts may preclude the witnesses involved from testifying if their testimony was tainted by the lack of sequestration.

■ Using the standards set by the *Steele* Court and the court in *Fendler,* we hold that the preclusion of testimony by a defense witness for violating a court's sequestration order is permissible where such violation vitiated the integrity of the evidence sought to be presented. In the present case, the witness heard the state's opening statement, wherein the jury was apprised that the evidence would show that the defendant was without sufficient funds to pay his overdue electric bill prior to the murder, but the day after had funds not only to pay that bill, but also to buy a new stereo. The defendant's witness also heard a portion of the defendant's girlfriend's testimony which suggested that the defendant may have received the money from his uncle, the witness at issue.

There is no other alternative but to conclude that what the defendant's witness heard placed in issue the integrity of his testimony. Thus, we conclude that the trial court's exclusion of the witness' testimony did not violate the defendant's sixth amendment rights.

## II.

The defendant next raises the issue of whether the defendant was denied a fair trial because the state failed to disclose

potential exculpatory evidence to him. The state argues that even though its file contained evidence which was at least arguably exculpatory,[14] neither prosecutor on the case was made aware of the existence of the exculpatory evidence until after the trial. Consequently, the nondisclosure of the exculpatory evidence to the defendant was inadvertent. Further, the state asserts that the exculpatory evidence involved is not material in nature. After the trial concluded in this case, the defendant filed a motion for a new trial. The lower court, on November 24, 1987, conducted a hearing on the defendant's motion in which the following factual events came to light.

Apparently, the day after the robbery/murder occurred, Iva Cremeans[15] contacted the Cabell County Sheriff's Department by phone and spoke with Deputy Robert Copley. Copley testified that Cremeans had called the Huntington Police Department and left her name and phone number. Additionally, she told the dispatcher "that she had driven past Wendy's at about five till 1:00 and saw a male with short brown hair and a moustache inside. He was sitting down and looked like he was writing something and described flab on him."[16]

Copley further testified that "at that time [in which he received this information] we had to interview Sigler and it appeared to coincide with his statement of where he was at.[17] There was a little bit of differ-ence in time, but they were approximate times. No one had watches." Moreover, at the time, the small discrepancy in the time periods[18] did not seem significant since what Cremeans had told the dispatcher seemed to coincide with what Sigler had told the police. Finally, Copley testified that it was not until after the motion for a new trial was filed that he went through his investigative notes and came across the information received from Cremeans. Copley's testimony indicated that at no time did he consider the information received from Cremeans to be exculpatory and further, even though the information was placed in the prosecutor's file, he did not discuss this information with the prosecutor's office prior to or during trial.

In addition to the deposition of Iva Cremeans, the lower court also heard the testimony of Linda Sue Leap, the person who picked up Cremeans on the night of the Wendy's crime. Leap testified that at the time in which they were stopped at the red light on Route 60 in front of Wendy's, Cremeans told her that "she seen a colored guy at Wendy's and I glanced and I did not see any colored guy." Further, Leap's testimony indicated that Cremeans told her that Cremeans had not seen the man actually in the Wendy's restaurant, but just "[o]ver by Wendy's." Leap also testified that a few days later, when the defendant's picture was either in the local newspaper or

---

**14.** It is important to note that the prosecutor argued before the lower court at the hearing on this matter that the evidence at issue was not exculpatory.

**15.** Iva Cremeans apparently married after giving this information to police for she is referred to by Deputy Copley as Iva Triplett.

**16.** A discovery deposition was taken on November 18, 1987, of Iva Cremeans and was entered in evidence at the hearing conducted on defendant's motion for a new trial. Cremeans' description of the man given during deposition was that she saw a white male in his late twenties sitting at a front table inside of Wendy's. She further indicated that he was wearing an Oxford shirt, and had short dark hair and a mustache. The man did not wear glasses.

**17.** To recall Sigler's testimony, he testified that upon his return to Wendy's he had gone back into the dining area with the defendant and the victim. Further, Officer Copley believed the description given by the caller also matched Sigler.

**18.** Copley testified that Sigler told him that he left Wendy's at 12:35 a.m. or 12:40 a.m. Sigler then testified at trial that he arrived at home at 12:37 a.m. Cremeans testified on direct examination in the deposition that she left her job at McDonald's at 12:20 a.m. or possibly a little later. However, on cross-examination she appeared much more uncertain as to the time element which is evidenced by her testimony that she had no idea what time she punched out at work and that she had no idea how long it took Sue Leap to come and pick her up from work. A time card presented by the defendant's attorney at the hearing on the motion for a new trial reflected that Cremeans punched out at 12:39 a.m.

appeared on television, Cremeans told her that " '[t]hat looks like the guy,' " referring to the man she had previously seen at Wendy's.

Finally, the prosecuting attorney stated to the court that while they did have the above information in their possession, they were unaware of it. Specifically, Mr. Chiles, the assistant prosecuting attorney, stated

> sometime after—I would say sometime after May the 13th when Mr. Stolze filed his discovery request, we were given the prosecution file. It came in one packet like this and there was some extra papers in a manila folder, this being—the dark brown folder being the primary prosecution report labeled action taken, case summary, forensic results, et cetera. And this was just additional material. Apparently included in that were the handwritten notes taken by someone during ... the investigation. One of the pages in the middle of all that is the information about the phone call....

Another reason given to the court by the assistant prosecuting attorney regarding his unawareness of the information was that he personally had not answered the discovery request made by the defendant, but that it had been handled by another prosecutor in the office.[19]

The lower court concluded that the jury verdict would not have been affected "by the inadvertent failure of the prosecutor to turn over the name of a potential witness to the defense prior to trial." The lower court, citing *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), reached this conclusion by applying the constitutional standard set down in these cases, "that the verdict should be should be

set aside and a new trial granted only if the trial court, after it considers the entire record, thinks that the new evidence would have caused the jury to reach a different result."

In *Agurs*, the Supreme Court considered whether the prosecutor had any constitutional duty to volunteer exculpatory matter to the defense, and if so, what standard or materiality gives rise to that duty. 427 U.S. at 107–08, 96 S.Ct. at 2399–400. The Supreme Court held that

> [t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt.

*Id.* at 112–13, 96 S.Ct. at 2401–02 (footnotes omitted).

The circuit court in the instant case held a lengthy post-trial hearing, and evaluated the evidence claimed by the defendant to have been exculpatory in the context of the full trial and made the following determination:

> Here there is sufficient evidence connecting the defendant to participation in the crime that led to the death to convince reasonable minds of his guilt. The fact that there may or may not have been an additional person or persons involved in the crime would not have prov-

---

**19.** The prosecuting attorney's office did not have an open file policy. However, we have previously stated that an open file policy does not excuse a prosecutor's failure to disclose exculpatory evidence. *See State v. Hall*, 174 W.Va. 787, 790–92, 329 S.E.2d 860, 863–64 (1985). Obviously, however, in most instances an open file policy would avoid a problem such as this. Especially where there is no such open file policy, it is incumbent on prosecutors to examine all information in their possession and to be diligent in providing the defendant with all exculpatory information.

en that this defendant was not also involved. His connection with money from the crime and the victim's blood on some of that money, in addition to his attempted flight from the authorities apparently convinced the jury of his guilt beyond a reasonable doubt.

This Court has previously dealt with prosecutions that have withheld potentially exculpatory evidence. In *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989) we were presented with a defendant's claim that the state had failed to disclose a statement given to police by the victim in which she indicated that one of the five men who had taken part in the sexual offenses committed against her had taken a less active part in the crimes.[20] 182 W.Va. at 352, 387 S.E.2d at 819. The defendant who was convicted of abduction with intent to defile, kidnapping, sexual assault in the second degree, and sexual abuse in the first degree maintained that he did not become aware of the victim's statement until several months after trial. *Id.* Further, it was undisputed by the state that they had the statement and failed to disclose to the defendant prior to trial.[21] *Id.* n. 4.

■ This Court held that the focus of inquiry in resolving whether the nondisclosure violated the defendant's due process right was as follows: " 'A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.' " *Id.* at 353, 387 S.E.2d at 820 and Syl.Pt. 4 (quoting Syl.Pt. 4, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982)). We also recognized in *Fortner* that the United States Supreme Court restated this test of materiality in *Bagley*,

473 U.S. at 667, 105 S.Ct. at 3375 when it held that " '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " 182 W.Va. at 353, 387 S.E.2d at 820 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383); *see also Agurs*, 427 U.S. at 97, 96 S.Ct. at 2392; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In the *Fortner* case, we concluded that the statement withheld by the prosecution did not contain clearly exculpatory evidence. *Id.* We also decided that the evidence at trial demonstrated that the defendant could not have been the "fifth man" alluded to by the victim in her statement to the police and accordingly, the statement could not have impacted on his guilt or innocence. *Id.*

■ In applying the same analysis utilized in *Fortner* to the present case, we must conclude that the nondisclosure to the defendant of the witness and her statement to police, in the context of all other evidence in this case did not violate the defendant's due process rights. The potentially exculpatory evidence, particularly in light of other contradictory evidence, in no way contradicts the state's evidence used to convict the defendant at trial. It is questionable whether the evidence would even establish that someone else not matching the defendant's description was present at the Wendy's near the time the crime was committed. This is apparent because of the conflicting testimony of Leap, the person who was present when Cremeans allegedly saw the white male in Wendy's, since Leap

---

**20.** The victim apparently stated to police that "this 'fifth man,' who had been sitting in the back seat of the car, had not had intercourse with her, had not touched her, and, in fact, had tried to offer her moral support during her ordeal...." *Fortner*, 182 W.Va. at 353, 387 S.E.2d at 819.

**21.** It is undisputed in the present case that while the defendant below argued before the lower court that the state had withheld exculpatory

evidence, the defendant offered no evidence that this was intentional on the state's part. Therefore, the trial court made a finding that "[t]he defendant does not claim that the failure of the State to follow up on the lead or to provide the information about it to him was intentional. He [the defendant] has submitted no proof to rebut the state's assertion that it was inadvertent and unintentional."

would testify that Cremeans told her that she saw a black man.

Therefore, we find no reversible error committed by the lower court; however, this decision in no way indicates that the state's failure to give complete discovery is excusable, nor does it indicate that this Court will countenance failure on the part of the state to provide a defendant with all exculpatory evidence.

## III.

The defendant's final assignment of error involves whether the jury voir dire conducted by the trial court, with defense counsel's acquiescence, was so deficient as to have denied the defendant a trial by an impartial jury. The defendant maintains that several members of the jury who exhibited signs of bias and prejudice were allowed to stay on the jury panel. Further the defendant contends that the trial judge improperly questioned the jury with respect to the possible taint media coverage may have had on the panel's impartiality. Finally, the defendant argues that the trial court should have included in its voir dire of jury members whether they might hold any racial prejudice or bias which might prevent them from being impartial triers of fact.

■ The defendant makes specific references to six members of the jury panel in support of his argument that several members of the jury exhibited signs of bias or prejudice and were allowed to stay on the jury. Those six prospective jurors include Jay Barnett; Robert Klei, Greg Law, Timothy Billups, James Issac and John Duncan. Of these six, Barnett was struck from the

panel by a peremptory challenge[22] and Isaac was struck from the panel by a challenge for cause.[23]

■ Jurors Klei, Law, Billups and Duncan all indicated during voir dire that they either knew one of the prosecuting attorneys on the case, knew people in the prosecutor's office and sheriff's department, or knew one of the state's witnesses in the case. The lower court conducted further inquiry of each of these jurors, questioning them to determine whether their acquaintance or knowledge of these various people would affect their ability to be fair and impartial. Each juror indicated that the knowledge of these various people would not affect impartiality and that he could base his decision in the case solely on the evidence and law presented to him at trial. The defense counsel neither sought additional voir dire of these jurors, nor challenged any of them for cause.

This Court has consistently held that " '[i]n a criminal case, the inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused.' " Syl.Pt. 2, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987) (quoting Syl.Pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944)); *accord* Syl.Pt. 7, *State v. Gibson*, 181 W.Va. 747, 384 S.E.2d 358 (1989). Upon review of the record, we find that the trial court did not abuse its discretion in this matter. To the contrary, each prospective juror who indicated a possible bias or prejudice was subjected to individual voir dire by the trial court which is the proper procedure established by this Court in syllabus point 5 of

22. We find no merit to the defendant's contention that his counsel at trial should have struck this juror for cause rather than utilizing a peremptory challenge based upon the prospective juror knowing the prosecuting attorneys on the case and one of the investigating officers. While the defense counsel at trial did not ask any follow-up questions on how well the prospective juror knew these individuals, the lower court did ask him if based upon the knowledge the prospective juror had of these individuals, could he still sit as a fair and impartial juror, to which Barnett responded that he could be impartial.

23. Regarding prospective juror Issac, the defendant contends that the entire jury panel was prejudiced when this prospective juror informed the trial court that "[i]t may be difficult," for him to base his decision in the case solely on the law and evidence because he had had the defendant as a student in high school. We again find no merit to defendant's argument that this single vague reference to the defendant in any way prejudiced the entire jury panel. Such a reference could have been favorable or unfavorable, and thus, could not be said to have influenced other jurors' thinking.

*State v. Beckett*, 172 W.Va. 817, 310 S.E.2d 883 (1983) (quoting Syl.Pt. 3, *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978)).

■ With regard to the defendant's claim of error in the manner in which the lower court covered the issue of pretrial publicity with the prospective jurors, the lower court did conduct the following voir dire concerning this issue:

Have you read about this case in the newspaper or heard about it over the radio?

(There were some affirmative answers.)

Have any of you formed some opinion as to the guilt or innocence of the accused or about the merits of this case from what you've read in the newspapers or heard about on radio or television? I take it by your silence your answers would all be no to that, that you have not formed any opinion.

Knowing what you know about this case and any opinion you may have formed about it, would you be satisfied to be tried by a jury having your particular frame of mind? I take it that your answer would be, yes, that you would be satisfied to be tried by jurors who have the same frame of mind that you do if you were accused in a case.

Further, the defense counsel was given the opportunity to ask the panel questions as well but did not request any additional voir dire on this matter. As we have previously indicated, "[w]here ... the party does not seek additional voir dire to demonstrate possible bias or prejudice, there is no error in the court's refusal to strike such prospective jurors for cause." *Beckett*, 172 W.Va. at 823, 310 S.E.2d at 889.

■ Finally, we find no merit to the defendant's argument that the jury voir dire was improper since the prospective jurors were not questioned about racial bias or prejudice. *See Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) (United States Supreme Court held absent showing of extreme racial impact on defendant's case, constitution does not require voir dire about racial prejudice); *see also*

*Turner v. Murray*, 476 U.S. 28, 33, 106 S.Ct. 1683, 1686, 90 L.Ed.2d 27 (1986); *Rosales–Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). Again, the defendant was given opportunity to submit questions to the jury panel and he did not include such a question. We find that the lower court did not abuse its discretion in conducting the jury voir dire.

Based upon the foregoing opinion, the decision of the Circuit Court of Cabell County is affirmed.

Affirmed.