359 S.E.2d 331

**STATE of West Virginia**

v.

**Delia A. BANJOMAN.**

**No. 16351.**

Supreme Court of Appeals of
West Virginia.

May 15, 1987.

Petition for Rehearing Filed
June 12, 1987.

Petition for Rehearing Refused
July 16, 1987.

Mary Beth Kershner, Asst. Atty. Gen., for appellant.

Wm. R. DeHaven, Martinsburg, for appellee.

MILLER, Justice:

Delia A. Banjoman was convicted of welfare fraud in violation of W.Va.Code, 9–5–4,[1] and received a sentence of one to five

1. W.Va.Code, 9–5–4, provides:

"Any person who obtains or attempts to obtain, or aids or abets an applicant or recipient in obtaining or attempting to obtain, by means of a willfully false statement or misrepresentation or by impersonation or any other fraudulent device:

years on November 8, 1982. She assigns several trial errors including: (1) the exemption of a welfare investigator from a witness sequestration order; (2) the refusal to disqualify a juror alleged to have been biased and to have answered falsely during voir dire; (3) a ruling whereby the State was permitted to cross-examine character witnesses with regard to the defendant's prior misconduct; and (4) the refusal to instruct the jury that certain government benefits are not treated as income in determining eligibility for other welfare programs. We conclude that the trial court committed no reversible error and, therefore, we affirm.

## I.

The evidence at trial indicated that the defendant was a lifelong resident of Charles Town, West Virginia. During the mid–1960s, she had two children, Dawn and Roxanne, by Luke Alfred French. In 1967, Mr. French died and the defendant applied for old-age, survivors, and disability insurance (OASDI)[2] benefits on behalf of his two children. Monthly benefit checks were

paid to her as representative payee for the children after approval of her OASDI application in or about November, 1967.[3] In September, 1970, the defendant married Roy D. Banjoman and had one daughter, Charnell, by that marriage. Mr. Banjoman and the defendant separated in 1975 and he apparently provided no further support for her or her children.

On May 19, 1980, the defendant applied for benefits under the Aid to Families with Dependent Children (AFDC)[4] program at the Jefferson County branch of the West Virginia Department of Welfare (DOW).[5] Warren Hess, a DOW employee, took her application and testified generally to the procedure he used in reviewing the application papers with her and in obtaining the requested information.

Each application begins with a short paragraph advising the applicant of possible criminal penalties for obtaining benefits by fraud.[6] Mr. Hess testified he read this paragraph aloud to the defendant and she signed and dated an acknowledgment. Mr. Hess then initiated a question-and-answer dialogue in which he read each provision of

---

"(1) Any class of welfare assistance to which the applicant or recipient is not entitled; or

"(2) Any class of welfare assistance in excess of that to which the applicant or recipient is justly entitled; shall upon conviction be punished as follows:

"(a) If the aggregate value of all funds or other benefits obtained or attempted to be obtained shall be five hundred dollars or less, the person so convicted shall be guilty of a misdemeanor and shall be fined not more than one thousand dollars or confined in jail not exceeding one year; or

"(b) If the aggregate value of all funds or other benefits obtained or attempted to be obtained shall exceed five hundred dollars, the person so convicted shall be guilty of a felony and shall be fined not more than five thousand dollars or confined in the penitentiary not less than one year nor more than five years."

**2.** Title II, Social Security Act, 49 Stat. 620 (1935), codified as amended at 42 U.S.C. §§ 401, et seq. "Child's insurance benefits" are defined in Section 402(d).

**3.** United States Treasury checks introduced at trial for the period in question showed OASDI payments in the amount of $453.60 for the months of April and May, 1980, and in the

amount of $518.60 per month from June, 1980, to March, 1981.

**4.** Title IV, Social Security Act, 49 Stat. 620 (1935), codified as amended at 42 U.S.C. §§ 601, et seq.

**5.** The name of the Department of Welfare was changed to the Department of Human Services by legislative act of February 28, 1983. 1983 W.Va.Acts ch. 106, codified at W.Va.Code, 9–2–1a (effective May 30, 1983). Since the name change was not yet effective during the period relevant to this case, we will refer to the Department of Welfare in this opinion.

**6.** This paragraph reads as follows:

"I, (Name) , do hereby furnish information to the West Virginia Department of Welfare in order that an eligibility determination can be made for benefits. It is understood that any information given is subject to verification by an authorized representative of the Department of Welfare. Also, it is understood that any person who obtains or attempts to obtain welfare benefits by means of a willfully false statement or misrepresentation or by impersonation or other fraudulent device can be charged with fraud. Punishment upon conviction may be by a fine up to five thousand dollars or confinement up to five years."

the application and recorded the defendant's oral response. When they discussed questions dealing with income and resources which were available to the household, Mr. Hess stated he specifically advised her that this included government benefits such as unemployment compensation and social security. After the requested information had been obtained, the defendant reviewed the completed application and certified that the answers were true and accurate to the best of her knowledge by signing it.

According to Mr. Hess, during the application process the defendant identified her two oldest children as Dawn and Roxanne *Lindsey*, and stated that their absent parent was a Luke F. *Lindsey*. She also provided Warrenton, Virginia, as Mr. Lindsey's last known address. Section M of the application, titled "OTHER INCOME," requested an itemization of all revenue sources other than wages for all members of the household. There was no mention of the OASDI benefits under Section M or in any of her other responses.

Jo Calkens, another DOW witness, testified that in September, 1980, the defendant reported to the DOW that she had begun employment at an area nursing home. Her hourly wage was reported to be $3.10 and she was scheduled to work between sixteen and twenty hours per week. Five months later, the defendant injured her hand and advised Bonnie Mason, a DOW case worker, that she would be temporarily unable to work. Shortly afterwards, she delivered to the DOW a pay stub dated March 30, 1981. She advised a DOW worker that she had returned to work and the stub represented her first pay. Work records subsequently obtained from her employer revealed that she had not reported two paychecks received in February and March, 1981.

On December 2, 1980, the defendant reapplied for AFDC benefits according to Mr. Hess, who again took the application. On her second application, she listed her oldest daughters as Dawn and Roxanne *French* and named Luke Alfred *French* as their absent parent. She gave no indication that Mr. French was deceased and once again gave Warrenton, Virginia, as the last known address. Her only source of income itemized under Section M was the wages from her part-time employment.

On March 31, 1981, the DOW learned of the OASDI benefits paid to the defendant through the aid of BENDIX, a data cross-listing system. Ms. Mason telephoned the defendant to inquire whether she was receiving any such benefits and the defendant strenuously denied having received them. Ms. Mason verified with the United States Department of Health and Human Services that the defendant had obtained OASDI benefits. It was learned that after each of her two applications to the DOW for AFDC benefits, the defendant had received monthly OASDI checks payable in her maiden name, Delia Lindsey. These checks were mailed to an address in Charles Town she had vacated six years before. Following the call from Ms. Mason, the defendant called the next day to inform the DOW that she was leaving the State to assume full-time employment in Maryland, but refused to identify the employer or to provide her new address. She also requested the termination of her AFDC benefits.

Francis Lantz, who oversaw the investigation by the DOW, testified that the amount of income unreported by Ms. Banjoman totaled $7,855.90, resulting in an overpayment of benefits in the amount of $4,431.04.

## II.

After the jury had been impaneled, the defendant moved to sequester all of the State and defense witnesses. This motion was promptly granted. The State then requested that Ms. Lantz, the DOW investigator, be exempted from the sequestration order to enable her to assist the prosecutor. The trial court agreed that Ms. Lantz could be exempted, and the defendant assigns this ruling as error.

### A.

Whether a witness may be exempted from a general sequestration order is a matter which is entrusted to the sound

**316**

discretion of the trial court, as we said in Syllabus Point 4 of *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974):

"The question as to which witnesses may be exempt from a sequestration of witnesses ordered by the court lies within the discretion of the trial court, and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal."

Our cases have recognized that one class of witnesses which would ordinarily be exempted includes persons knowledgeable about the case who are present to lend assistance to the prosecutor during trial. This rule was announced in *State v. Hoke,* 76 W.Va. 36, 84 S.E. 1054 (1915), and recently restated in Syllabus Point 5 of *State v. Wilson, supra:*

" 'It is within the judicial discretion of the trial court to permit a witness for the State, who is familiar with the facts on which the prosecuting attorney relies to establish the guilt of the accused, to be present in court during the trial to aid him in conducting the examination of other witnesses.' Point 5, syllabus, *State v. Hoke,* 76 W.Va. 36 [84 S.E. 1054 (1915) ]." [7]

Traditionally, our exempt witness rule has been applied to police officers who were actively involved in the investigation of the offense. We recognize, however, as have other jurisdictions, that it has become increasingly common to designate government agents other than police officers to represent the State and to aid in the prosecution of cases in which they have investigated. *E.g., United States v. Perry,* 643 F.2d 38 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (drug enforcement agent); *United States v. Parodi,* 703 F.2d 768 (4th Cir.1983) (narcotics agent); *United States v. Alvarado,* 647 F.2d 537 (5th Cir.1981) (drug enforcement agent); *United States v. Shearer,* 606 F.2d 819 (8th Cir.1979) (FBI agent); *United States v. Jones,* 687 F.2d 1265 (8th Cir. 1982) (city police officer appointed as "case agent"); *see generally* 2 Wharton's Criminal Evidence § 376 (14th ed. 1986).

We see no principled distinction between police officers and other agents, such as Ms. Lantz, who are charged with similar investigative responsibility. We thus conclude that Ms. Lantz was properly exempted from the court's sequestration of witness order.

### B.

Though Ms. Lantz's exemption from the order was proper, the defendant argues further that reversal is warranted because Ms. Lantz testified only after observing all other State witnesses. The defendant's position is that Ms. Lantz was able to rehabilitate the testimony of State witnesses who preceded her, resulting in substantial prejudice to her defense. From a factual standpoint, this did not occur.

We recognized in Syllabus Point 2 of *State v. Harriston,* 162 W.Va. 908, 253 S.E.2d 685 (1979), that an exempt witness should ordinarily be called first:

"If a State witness is excluded from sequestration, he or she ordinarily should be called first to ensure, as far as possible, that the witness will not be educated by testimony of other witnesses, which, of course, is the harm sequestration seeks to prevent."

This rule is not ironclad and, as the Syllabus Point suggests, must be read in light of the policy which sequestration seeks to enforce, which is to prevent witnesses from shaping their testimony to harmonize it with that of other witnesses.

We were careful to point out in note 8 of *Harriston,* 162 W.Va. at 913, 253 S.E.2d at 688, that some flexibility was needed in applying the rule and quoted with approval this language from *United States v. Frazier,* 417 F.2d 1138, 1139 (4th Cir.1969), *cert.*

**7.** We also observe that Rule 615 of the West Virginia Rules of Evidence, which were adopted on December 18, 1984, and became effective on February 1, 1985, provides that a sequestration order does not apply to "an officer or employee of a party which is not a natural person designated as its representative."

*denied,* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970):

"[I]f it is anticipated that the agent [of the State] will be called as a witness he should ordinarily be called first so as to avoid giving the prosecution unfair advantage or the appearance that the prosecution is being favored. *This should be the order of presentation unless in the judge's considered opinion, it would unduly break the continuity or seriously impair the coherence of the Government's proof.*" (Emphasis added).

■ In this case, we believe substantial reasons existed to justify the decision to have Ms. Lantz testify at the conclusion of the State's case-in-chief. Ms. Lantz's testimony was limited to the calculation of benefits to which the defendant was entitled and the amount of overpayments made by the State. This was based primarily upon evidence which had been previously introduced. Logically, her testimony should have been presented at the conclusion of the State's evidence as it represented the summation of two days of testimonial and documentary evidence from a wide variety of sources. It would have been highly impractical, if not impossible, to require Ms. Lantz to testify before the information upon which her testimony was based had been properly admitted.

Furthermore, we do not believe her testimony was susceptible of being colored by the testimony of others. Rather, her testimony was limited to a review of applicable rules and regulations and to technical mathematical calculations. This did not operate in any manner to bolster or rehabilitate the testimony of prior State witnesses. For these reasons, we conclude the trial court did not err in allowing Ms. Lantz to testify at the close of the State's case-in-chief.

### III.

The defendant also alleges the trial court erred in refusing to disqualify a juror, or to award a new trial, based upon allegations of juror bias. During the voir dire, the court inquired whether any of the venire were acquainted with the defendant or had any prior knowledge of the case. Trina Dunn, a prospective juror, did not give an affirmative response to either of these questions. However, in responding to other voir dire questions, she revealed that she was employed by a bank which she later named as People's Bank in Charles Town.

Evidence introduced at trial showed that most of the welfare checks issued to the defendant were negotiated at People's Bank to various tellers, including "Teller No. 9." During the examination of the assistant cashier of People's Bank, it was learned that "Teller No. 9" was one of the jurors, presumably Ms. Dunn. The defendant raises two arguments for reversal: (1) that Ms. Dunn was biased against her, and (2) that she was prejudiced by her inability to call Ms. Dunn to testify on her behalf.

■ We held in Syllabus Point 1 of *State v. Scotchel,* 168 W.Va. 545, 285 S.E.2d 384 (1981), that a jury verdict will ordinarily not be impeached on the basis of juror misconduct where the alleged impropriety relates solely to the jury's deliberative process:

"A jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict."

Where, however, the alleged impropriety is "extrinsic to" the jury's deliberative process, then the verdict may be subject to impeachment. *Scotchel,* 168 W.Va. at 547–49, 285 S.E.2d at 386–87. We indicated in *Scotchel* that an allegation that one or more of the jurors was initially biased or prejudiced against a party may provide a basis for attacking the verdict on appeal. 168 W.Va. at 549, 285 S.E.2d at 387–88.

■ The defendant's allegations that Ms. Dunn had a preexisting bias against her and had given false answers [8] during voir

---

**8.** To impeach a jury verdict on the ground of juror bias a defendant must show that one or more of the jurors was prejudiced or biased such that he was unable to render a verdict impartially on the basis of the evidence and the law given by the court. *See, e.g., State v. Guth-*

dire are without a factual basis in the record. There are no affidavits to support this allegation, nor was there a request for a hearing below to inquire into the allegation.[9] Ms. Dunn answered truthfully to the voir dire and revealed she worked at the People's Bank in Charles Town. The defense made no effort to make further inquiry in order to disqualify her on the basis that she had some knowledge of the case.

■ It is apparent that even if Ms. Dunn were the teller that cashed some of the defendant's checks, we cannot assume from this fact that she remembered the defendant or had any reason to connect the checks to the charge being tried. We find nothing in the record to warrant a conclusion of bias or prejudice on the part of Ms. Dunn.

We also find no merit in the defendant's alternative argument that she was prejudiced by her inability to call Ms. Dunn as a witness on her behalf. There is no voucher of testimony or even an avowal of what helpful information would have been provided by Ms. Dunn. Since the receipt and cashing of the welfare checks were undisputed, it is difficult to imagine how the testimony of a bank teller would have proved exculpatory.[10]

## IV.

The defendant also contends it was error to permit the prosecutor to cross-examine her character witnesses by inquiring whether they had knowledge of two acts of misconduct by the defendant. A total of nine character witnesses were called,[11] all of whom testified that the defendant enjoyed a good reputation for honesty and veracity or, alternatively, that she did not have a general reputation for dishonesty.

Prior to any cross-examination of the character witnesses, a bench conference was held during which the prosecutor advised that he intended to cross-examine such witnesses regarding two acts of misconduct previously committed by the defendant: (1) an incident in which the defendant had attempted to obtain insurance proceeds for property which had been falsely represented as stolen, which occurred about two years before the trial, and (2) an incident of child abuse which had been investigated by the DOW, but on which no charges were brought. This latter incident occurred approximately three years before the trial.

The State also outlined the factual basis for the two incidents and stated that it was ready with witnesses and documents to demonstrate that it had a good faith basis for these inquiries. The defendant objected to the proposed line of questioning and, after an extended discussion, the court overruled the objection and allowed the cross-examination.[12]

At the close of all the evidence, the State at an *in camera* hearing established on the record through several witnesses the factu-

---

*rie,* 173 W.Va. 290, 315 S.E.2d 397 (1984); *State v. White,* 171 W.Va. 658, 301 S.E.2d 615 (1983).

**9.** We held in Syllabus Point 2 of *W.Va. Human Rights Comm'n v. Tenpin Lounge, Inc.,* 158 W.Va. 349, 211 S.E.2d 349 (1975), as follows: "Upon an allegation before the trial court that a juror falsely answered a *material* question on *voir dire,* and where request is made for a hearing to determine the truth or falsity of such allegation it is reversible error for the trial court to refuse such hearing." (Emphasis in original).

**10.** Having determined that the trial court did not err in its refusal to disqualify Ms. Dunn, we do not address the defendant's further assertion that the failure to select an alternate juror constituted reversible error.

**11.** In addition, the defendant elicited character testimony from one of the State witnesses, a mail carrier from the Charles Town area who had delivered the OASDI and AFDC checks to her.

**12.** The cross-examination was limited to questions to the effect that, "I gather you have not heard that the defendant had committed an insurance fraud when after a fire at her home, she reported to her insurance company that several appliances were stolen when they were not"; and "I gather you have not heard that she committed an act of child abuse." Several courts have held that this form of questioning is proper, and that attempts to broaden such questioning to incorporate the details of the wrongful acts or to intimate their truthfulness should be restricted. *E.g., State v. Steenson,* 35 N.J. Super. 103, 113 A.2d 203 (1955); *State v. Howard,* 57 Ohio App.2d 1, 385 N.E.2d 308 (1978); *State v. Johnson,* 389 So.2d 372 (La.1980).

al basis surrounding these prior acts of misconduct. The jury was instructed that the cross-examination questions had been asked for the limited purpose of testing the credibility of the character witnesses and were not to be considered on the issue of guilt.

### A.

This case was tried prior to the adoption of our Rules of Evidence which became effective on February 1, 1985. Under Rule 405(a), in certain instances, proof of prior misconduct of the defendant may be admissible to test the credibility of his character witnesses.[13] In *State v. Nuckols*, 152 W.Va. 736, 758, 166 S.E.2d 3, 16–17 (1968), we recognized, without any elaborate discussion, that a witness who had testified about the good character of the defendant could be cross-examined with regard to specific things the witness "should have heard that would indicate the conclusion that the [defendant's] reputation was good was incorrect or not sustained." (Citations omitted). This is in accord with the general rule elsewhere. McCormick on Evidence § 191 (1984); F. Cleckley, Handbook on Evidence for West Virginia Lawyers 320–21 (1985); Annot., 13 A.L.R.4th 796 (1982).

We have not had occasion, however, to delineate the extent of this rule. It is generally agreed that under the guise of cross-examination of the defendant's character witnesses, the State should not be permitted to utilize any episode or rumor in the defendant's past that might denigrate his or her character. The resulting jury prejudice from such an open-ended cross-examination has long been recognized. McCormick on Evidence § 191 (1984); 3A Wigmore, *Evidence* § 988 (Chadbourne rev. 1970).

■ For this reason, most jurisdictions provide some limitation on the scope of cross-examination questions put to a defendant's character witnesses regarding their knowledge of specific instances of the de-fendant's misconduct. There must initially be, by way of an *in camera* hearing, a disclosure of the proposed specific misconduct questions. The State must produce documents or witnesses from which the court may determine whether there is a good faith basis in fact that the misconduct actually occurred and would have been known to some degree in the community.

The purpose of this initial limitation is to prevent the cross-examiner from inquiring into incidents that have no basis in fact or are so remote or trivial that the witness who has testified to the defendant's reputation could not be expected to have heard of them. This is consistent with the purpose of the cross-examination, which is to test the character witness's credibility.

A second limitation requires that the specific misconduct impeachment relate to facts which bear upon the character traits that have been placed in issue by the character testimony on direct examination.

Finally, the court must make the ultimate determination as to whether the probative value of the defendant's specific incident of misconduct, which is to be the subject of the cross-examination, outweighs its prejudicial value. These various principles were summarized in *United States v. Lewis*, 482 F.2d 632, 639 (D.C.Cir.1973), based upon a synthesis of federal cases:

"The courts have, however, developed a series of restrictions designed to mitigate the potential hazard [abuse of cross-examination of character witnesses]. The matters the witness is to be asked about should first be established to the trial judge's satisfaction as actual events. The questions put to the witness should be carefully and narrowly framed. The questions, of course, must be restricted to events affecting the character trait or traits the accused has placed in issue; their propriety is to be determined 'by comparison with the reputation asserted.' The process demands close supervision; '[w]ide discretion is accompanied by

---

**13.** Rule 405(a), W.V.R.E., provides: *"Reputation or Opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

heavy responsibility on trial courts to protect the practice from any misuse.' And obedient to the principle governing any use of evidence indicative of other criminality, the inquiry should be permitted only when 'the probative value of the information which might be elicited outweighs the prejudice to the defendant.' " (Footnotes omitted).

See also United States v. Bright, 588 F.2d 504 (5th Cir.1979); United States v. Wells, 525 F.2d 974 (5th Cir.1976); Mullins v. United States, 487 F.2d 581 (8th Cir.1973); United States v. Glass, 709 F.2d 669 (11th Cir.1983); State v. Hinton, 206 Kan. 500, 479 P.2d 910 (1971); State v. Johnson, 389 So.2d 372 (La.1980); State v. Steensen, 35 N.J.Super. 103, 113 A.2d 203 (1955); Miller v. State, 418 P.2d 220 (Okla.Crim.1966); see generally Annot., 13 A.L.R.4th 796 (1982).

Once the court determines at the in camera hearing that the specific-misconduct cross-examination of a character witness may proceed, the jury should be informed that its purpose is to test the credibility of the character witness and it is not to be considered as bearing on the defendant's guilt in the present trial. State v. Johnson, supra; State v. Steenson, supra.

■ In the present case, the trial court utilized an in camera hearing and the prosecutor outlined the information relied upon to establish a good faith basis in fact that the misconduct had occurred. The two incidents were not too remote in time and would appear to have had a sufficient degree of notoriety that they might have been bruited about in the community such that a character witness might have heard of them.

The incident of attempting to get insurance money by misstating to the insurance company that her property had been stolen after the fire in her home related to the character traits brought into issue by her character witnesses, i.e., honesty and veracity.

The incident of child abuse presents a more difficult problem because it did not relate to the character traits brought into issue at the trial. We find that the court should not have permitted this incident to be utilized on cross-examination.

■ We decline to find this to constitute reversible error since we conclude that the State had a strong case and that this cross-examination question related to a peripheral issue and was not emphasized by the prosecution. Several of the character witnesses were not asked about the abuse incident and the prosecution did not mention this incident in its closing argument. The court gave a cautionary instruction advising that the cross-examination questions could not be considered on the issue of the defendant's guilt. Thus, we conclude the harmless error test formulated in Syllabus Point 2 of State v. Atkins, 163 W.Va. 502, 261 S.E.2d 55 (1979), cert. denied, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), is applicable:

"Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury."

See also State v. Thompson, 176 W.Va. 300, 306, 342 S.E.2d 268, 274–75 (1986); State v. Tanner, 171 W.Va. 529, ——, 301 S.E.2d 160, 164 (1982); State v. Church, 168 W.Va. 408, 414–15, 284 S.E.2d 897, 902 (1981).

V.

The defendant also contends the trial court erred in refusing to instruct the jury that OASDI benefits are not to be regarded as income for purposes of determining AFDC eligibility. She relies principally on the general definition of income in the Internal Revenue Code, 26 U.S.C. § 61, and

the exclusion of death benefits from gross income under 26 U.S.C. § 101. We conclude that the OASDI benefits here involved were properly includible as income and subject to disclosure by the defendant in applying for AFDC benefits.

 AFDC is a national/state cooperative program whose purpose is to render monetary assistance to "needy dependent children." 42 U.S.C. § 601. Though participation in the program is wholly voluntary, once a state elects to do so it is obligated to comply with all provisions of the AFDC legislation and regulations. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). To be approved, a state's AFDC plan must provide a method for determining the need of applicants as follows:

"[The State agency] ... shall, in determining need, take into consideration any other *income and resources of any child or relative claiming aid to families with dependent children*, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid...." 42 U.S.C. § 602(a)(7)(A). (Emphasis added).

The term "income" is used in Section 602 with an eye to evaluating the maintenance needs of the applicant by gauging the resources at his or her disposal. It bears no relationship of any kind to the Internal Revenue Code, which deals with the taxability of income. The fact that certain income is exempt for federal income tax purposes does not mean that it becomes nonincome under the AFDC program.

 Under AFDC regulations, income is defined broadly to include all revenue sources available to or legally obtainable by the applicant or others in the household, less any appropriate "disregards." 45 C.F.R. § 233.20(a)(3)(ii)(D). These "disregards" are simply categories of revenue which are authorized to be deducted from the income and resources of the household. Thus, under AFDC guidelines, all sources of income are to be included unless they are specifically exempted or disregarded. We note that no "disregard" exists for OASDI benefits. Accordingly, courts have uniformly held that OASDI benefits, under 42 U.S.C. §§ 401, *et seq.*, paid to minor children living in the applicant's household are includible as income for purposes of determining the applicant's eligibility for AFDC benefits under 42 U.S.C. §§ 601, *et seq. E.g., Bosh v. Fahey*, 53 N.Y.2d 896, 440 N.Y.S.2d 626, 423 N.E.2d 49 (1981); *McCall v. Shapiro*, 292 F.Supp. 268 (D.Conn.1968), *aff'd*, 416 F.2d 246 (2d Cir. 1969); *Barnes v. Reagen*, 501 F.Supp. 215 (N.D.Iowa 1980).[14]

### VI.

The defendant asserts that the trial court impermissibly injected himself into the State's case and examined a number of State witnesses. By this conduct and the court's exchanges with defense counsel, it is asserted the court displayed prejudice which affected the jury's verdict.

It is recognized that a trial court has the right to control the orderly process of proceedings before him, and may intervene so long as he does not prejudice the defendant's case. *State v. Jenkins*, 176 W.Va. 652, 346 S.E.2d 802 (1986); *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979). We have consistently observed, however, that a trial judge occupies a "unique position" from which he may wittingly or unwittingly influence the jury in its deliberations. *State v. Whittington*, 168 W.Va.

---

**14.** The defendant also advances two other related arguments: (1) that the AFDC application utilized by the DOW is unconstitutionally vague and ambiguous, and (2) that the DOW should have determined her entitlement to AFDC benefits prior to the institution of criminal proceedings. We disagree with both propositions. The record reveals that the defendant was specifically advised by DOW representatives that OASDI benefits were to be reported. Since she had actual knowledge of this requirement, we need not decide whether the application adequately apprised her of it. With regard to her second argument, we are not cited nor are we aware of any requirement of an administrative hearing as a condition precedent to prosecution under W.Va.Code, 9–5–4.

288, 284 S.E.2d 363 (1981); *State v. Wotring*, 167 W.Va. 104, 279 S.E.2d 182 (1981); *State v. McGee*, 160 W.Va. 1, 230 S.E.2d 832 (1976), *overruled on other grounds, State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977). He is cautioned to refrain from commenting on questions for the jury's determination and if, by his words or conduct, he "indicates his opinion on any material matter," a reversal would be warranted. *McGee*, 160 W.Va. at 6, 230 S.E.2d at 835–36.

 We have reviewed the record in its entirety and conclude that the trial court did not intimate his opinion on any material issues or otherwise impair the defense of the case. Though it appears that the defense attorney, in the zeal of his representation, may have clashed with the trial court, we believe the statements by the court in his rulings from the bench and in directing the conduct of the trial were within the bounds of judicial propriety. We find no error on this issue.

■ Finally, the defendant complains that the State's instruction defining the elements of the crime was improper. Her main objection is the use of the word "or" in the instruction between the phrases "willfully, intentionally and knowingly make a false statement or misrepresentation" or "willfully, intentionally and knowingly withhold information." The statute, W.Va.Code, 9–5–4, contains several alternative grounds by which welfare fraud may be committed, i.e., "by means of a willfully false statement or misrepresentation or by impersonation or any other fraudulent device." [15]

In Syllabus Point 8 of *State v. Slie*, 158 W.Va. 672, 213 S.E.2d 109 (1975), we held that an instruction for a statutory offense is not erroneous if it substantially follows the language of the statute:

"An instruction for a statutory offense is sufficient if it adopts and follows the language of the statute, or uses substantially equivalent language and plainly informs the jury of the particular offense for which the defendant is charged."

**15.** For the full text of W.Va.Code, 9–5–4, *see*

*See also State v. Wilson*, 145 W.Va. 261, 114 S.E.2d 465 (1960).

For the foregoing reasons, we affirm the judgment of the Circuit Court of Jefferson County.

Affirmed.