558 S.E.2d 650

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Rickey CAREY, Defendant Below, Appellant.**

No. 29325.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 7, 2001.

Decided Nov. 30, 2001.

Dissenting Opinion of Justice Albright Dec. 11, 2001.

Darrell V. McGraw, Jr., Esq., Attorney General, Heather D. Foster, Esq., Assistant Attorney General, Charleston, for Appellee.

James T. Kratovil, Esq., Charles Town, for Appellant.

PER CURIAM.

The appellant, Rickey Carey, was convicted of first degree murder without a recommendation of mercy in the Circuit Court of Jefferson County. He appeals from the guilty verdict alleging numerous assignments of error. After a complete review of the record, we find no error and affirm.

## I.

## FACTS

Lori Lynn Curry was murdered on September 6, 1998 in a shed or storage building

which is located on the appellant's family home place in Ranson, West Virginia. The home place is occupied by the appellant's brother and the appellant sometimes spends nights there. On the day of the murder, the appellant was sitting on the front porch when the victim arrived around noon. The appellant and the victim immediately went to the shed and had sex. An argument then ensued presumably regarding whether the victim was going to try to reconcile with her estranged husband and end her romantic relationship with the appellant. The appellant stabbed the victim four times and shot her twice, once in the chest and once in the head, at close range with a twelve gauge shotgun. The appellant and the victim spent about one-half hour together in the shed.

The appellant left the scene in his car. The victim's body was found by neighbors who were cooking lunch in their yard on a grill when they heard the gunshots. There were no suspects except the appellant. A warrant was issued for his arrest. The appellant was arrested around midnight after purchasing gasoline at a convenience store in Shepherdstown. The arresting officers, Trooper Richard Shockey and Officer D.K. Colbert, alerted police officers in the town of Ranson. Lieutenant Robbie Roberts arrived at the scene of the arrest. He and Trooper Shockey transported the appellant to the Ranson Police Department where his *Miranda* rights were read to him. He signed a waiver of rights form and gave a statement to the police in the early morning hours of September 7, 1998. The appellant admitted he shot the victim twice but insisted that he did not remember stabbing her.

On January 20, 1999, the appellant was indicted for first degree murder. The appellant subsequently filed a motion to suppress the statement he gave to police officers following his arrest. The circuit court held a suppression hearing wherein defense counsel challenged the admission of the statement based upon the appellant's incompetence to give the statement freely and voluntarily. The appellant contended he took seventy-two over-the-counter sleeping pills after he committed the murder but before he was arrested. Lieutenant Roberts testified that the

appellant told the officers he had taken some sleeping pills, but he was coherent, understood what he was doing, and his memory of past events was clear. The circuit court entered an order denying the motion to suppress on April 21, 1999.

A jury trial was held on October 26–29, 1999. At the close of the evidence, the jury found the appellant guilty of first degree murder without a recommendation of mercy. He filed a motion for a new trial which was denied by the court on November 17, 1999. It is from this order the appellant appeals.

## II.

## DISCUSSION

On appeal, the appellant alleges the circuit court erred by allowing gruesome photographs to be shown to the jury when other photographs that would not have inflamed the jury were available; by allowing prior convictions to be used for impeachment purposes; by allowing the jury to listen to the appellant's statement; and by improperly instructing the jury. After carefully reviewing the record submitted on appeal, we find no reversible error.

### A. Photographs

The appellant first alleges that gruesome photographs of the crime scene and the victim were improperly admitted at trial because they were cumulative and redundant. He complains that Exhibits 8 and 9 are repetitive of Exhibit 5 which had previously been admitted. He further contends that pictures of his underwear, the knife, the gun, and his shoes should not have been offered into evidence because the actual articles were admitted into evidence during the trial. Therefore, says the appellant, these photographs were cumulative.

Upon reviewing the transcript, we find that the trial judge held a hearing outside the presence of the jury regarding the admissibility of evidence. On October 26, 1999, the court discussed with counsel the admissibility of Exhibit 5, a photograph which shows the victim at the crime scene. The massive head wound is not visible as the victim's upper body is covered with a sheet. Defense counsel objected to the admissibility of the

photograph on the grounds that it was gruesome, rude and obscene, and not relevant in that the diagram of the crime scene was available. The prosecutor argued that the diagram was "a cold drawing that has stick people and representations of what is there at the scene." The State believed the jury was entitled to see the body as it was left at the crime scene in a partial state of undress with underwear to the victim's knees, two socks on, one shoe partially on and one shoe off. The photograph also placed the appellant's shoes in context and corroborated testimony that he left the scene shoeless. The court determined the evidence was relevant and explained its ruling as follows:

It shows the position of the body. It shows the state of dress of the body. It is supportive of the state's theory of where the parties were when the shots were fired, when the attack was made. It is relevant evidence. The question then is whether its probative value is substantially outweighed by unfair prejudice. Now, in this connection it does not—it is in no way a head shot. You know, you—actually I disagree with the Prosecutor. He says you can look at this and determine that there was a head wound. All I can determine is that there was a wound to the upper body in that photograph. But in any event, it appears to me that it is—that it meets the standards of Rule 401 and 403, that I don't perceive it as being cumulative, and I would—if it is otherwise admissible, foundation wise, I think it comes in.

The court continued the hearing regarding the admissibility of evidence on October 27, 1999. During this hearing, defense counsel withdrew his objection to Exhibit 9. As to whether Exhibits 5 and 8 are cumulative, the following colloquy took place:

[PROSECUTOR]: If you look at number 5, number 5 is a relatively compact close-up shot of the victim's body, the fact that she has one shoe off, one shoe partly on, and it is a very narrow area. The

officer zoomed down on her body. The other exhibit which is number?

THE COURT: Eight.

[DEFENSE COUNSEL]: Eight.

[THE PROSECUTOR]: Gives you the expanse of the room. Places the victim's body in the context of the room. That will assist the trier of fact, the jury, to place the body in the context of the room when comparing the photographs to the crime scene drawing. I certainly think it is relevant. It helps the trier of fact, because the other picture—it is a narrower picture of the victim's body. I think it will assist the trier of fact. I think it is needed because it puts the victim's body in the larger context of the room. I think—I have probably 8 or 9 more pictures of that same scene from different angles. I have chosen only one. I think it is an important piece of evidence. For that reason, it is probative.

Defense counsel then reiterated his belief that the photographs were cumulative and should not be introduced if the crime scene drawing was admitted into evidence. He then partially retracted the objection by stating, "If you want to show a picture of the body, I think you have the right to show one picture of the body, but I think a second picture of the body is cumulative." The court then conducted a Rule 403 [1] balancing test and concluded the photograph was "not subject to exclusion."

The State offered the photograph of the underwear to "show[ ] the underwear in the doorway area, and you can tell that it tends to establish where it was[;] ... places it in context of what I believe is an open doorway. There seems to be light shining through there in the form of a doorway. It tends to establish where it was." The court did not believe the photograph was cumulative and explained, "It is a photograph at the crime scene. The fact that it is referred to in other, you know, basically the crime scene

---

1. West Virginia Rule of Evidence 403 states:

**Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

sketch is a memorialization of the investigating officer's testimony. But the state still needs to prove—provide the best evidence of the existence of a piece of evidence that it can."

Defense counsel then objected to the admission of the picture of the appellant's shoes which were left at the crime scene when he fled. The court ruled the photograph was admissible by stating, "Well, these shoes can be seen if you know what you are looking for in other photographs, but they certainly cannot be seen in such detail. And I think that their juxtaposition next to the feet of the victim tend to be especially probative." The appellant does not seriously argue that the photographs of the murder weapons shown as they were left by him at the crime scene should not have been admitted into evidence.

■ Although the appellant more strenuously stresses the cumulativeness of the photographs rather than gruesomeness, we nonetheless begin our analysis with the common precept which states that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." Syllabus Point 8, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). Syllabus Points 9 and 10 of *Derr* explain the role each of these rules plays in the admissibility of evidence:

> Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.
>
> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

■ We believe the trial court properly determined the relevancy of each of these photographs before conducting the Rule 403 balancing test. The court concluded that the photographs depicted the victim's body in the context of the crime scene, showed exactly where the appellant left the knife and gun at the scene, and corroborated the fact that the appellant indeed fled the scene without underwear or shoes. We cannot say the circuit court clearly abused its discretion by finding this probative value outweighed the danger of unfair prejudice, confusion, or undue delay. We also note that the State did not attempt to admit into evidence any of the photographs which show the top of the victim's head blown away. Rather, the prosecutor carefully selected photographs which were not gruesome or cropped out the head shots in an effort to not unduly prejudice the jury.

■ A more serious contention is the fact that the State introduced Exhibit 13, a photograph of the appellant in shackles, into evidence. The photograph portrays the appellant's feet and was introduced to show that he was shoeless at the time he was taken into custody. Defense counsel objected stating that the picture would unduly prejudice the jury. The State contended that the fact that the appellant was shackled was "happen chance" and suggested that the trial court determine "whether seeing the defendant shackled in the presence of a jury or a juror has prejudicial effect." The trial court determined the photograph was highly probative and explained its ruling:

> Gentlemen, you know, I agree with [the prosecutor] that the law is not crystal clear on the questions of shackles in the courtroom. The reason there is some concern about that is if the individual is seen by the

jury as being in custody at the time of the trial, the fear is that that may have some impression upon the jury. What is being offered here is a photograph of him at the time of his arrest showing his feet without shoes on. It is a highly probative photograph. I don't think the jurors are going to be shocked to see him in restraints at the time of his arrest. It doesn't carry the same message as it would carry if we brought him in here in this courtroom in his orange suit with shackles on. But even that, as you say, the Fourth Circuit probably wouldn't be concerned about that. I think our Supreme Court would be. But I don't think our Supreme Court would have a problem with this. So, I find this photograph to be highly probative.

The appellant contends the photograph has no probative value because it was taken at the Ranson Police Department rather than at the time he was initially arrested. He argues that the picture is extremely prejudicial even though it does not rise to the level of bringing a defendant into court in front of the jury in shackles. The State avers that showing a photograph of a defendant in shackles at the time of his arrest is not analogous to bringing a defendant to trial in shackles or handcuffs or clothed in prison apparel; the jury would expect a defendant to be shackled when he is arrested and would not be unduly surprised to see a picture of him in shackles at that time. The State believes that this photograph, like any other photograph, is admissible if the probative value outweighs prejudicial impact.

This Court has not previously had occasion to address this precise issue. However, we have had opportunity to discuss the issue of bringing a defendant to court in shackles or handcuffs. In *State v. Brewster,* 164 W.Va. 173, 261 S.E.2d 77 (1979), Brewster was forced to wear handcuffs while he was on trial for armed robbery. No record was made to determine if manifest necessity existed. Brewster appealed. On appeal, this Court held that "[a] criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syllabus Point 3, *id.*

The *Brewster* Court concluded that automatic reversal was not required. Instead, the case was remanded for an evidentiary hearing to determine if sufficient facts existed to warrant trying the defendant in handcuffs. If so, the conviction would be re-entered. If not, the defendant would be granted a new trial.

We also look to *State v. Linkous,* 177 W.Va. 621, 355 S.E.2d 410 (1987), for guidance. Linkous sought to overturn a conviction of first degree murder without mercy primarily because he was initially handcuffed when he was brought into the courtroom for trial. This Court contrasted the amount of time Brewster spent in restraints in front of the jury with the amount of time Linkous was restrained in court. The Court then reasoned that an obvious security need, to reduce chances of escape and protect the public safety, exists to have some physical restraints on prisoners when they are moved from jail to the courthouse. The Court cautioned, "The better practice is to remove restraints before a prisoner is brought before the jury," *id.,* 177 W.Va. at 624, 355 S.E.2d at 413, but held in Syllabus Point 2 that "[o]rdinarily, it is not reversible error nor grounds for a mistrial to proceed to try a criminal defendant with a jury panel that may have seen him in handcuffs for a brief period of time prior to trial."

In the case *sub judice,* the photograph taken at the murder scene depicts the appellant's shoes which were left in the shed when he fled. The photograph taken of the appellant at the time of his arrest shows he was still barefoot almost twelve hours later. These two photographs have compelling probative value which is extremely relevant on the issue of the appellant's guilt. Clearly both pictures should have been admitted into evidence. However, we are troubled that the photograph taken of the appellant after he was arrested depicts him in shackles. We caution trial courts in the strongest possible terms to avoid allowing jurors to see a defendant in shackles—whether in the flesh, in photographs, or by any other method.[2]

---

2. This practice not only protects the presumption of innocence of the defendant, but also, and

■ Even though we believe the better practice would have been to remove the shackles before photographing the defendant's bare feet, based on the overwhelming evidence of guilt, admission of the photograph is not reversible error. *See State v. Rood*, 188 W.Va. 39, 422 S.E.2d 516 (1992) (per curiam) (the fact that the defendant was tried in prison attire could not have adversely affected the jury in its deliberation because of the overwhelming evidence of guilt). In the appellant's case, it is critical that he did not at any time contend that he did not commit this heinous crime; we firmly believe the photograph did not adversely affect the jury. Even if the photograph had depicted Mr. Carey in a Boy Scout uniform, under the facts presented here, we believe the jury would not have been swayed.

## B. Prior Convictions

■ The appellant contends his prior convictions should not have been used to impeach his character witness, Kentin Ray Kimble. Even though he admits the court properly conducted an *in camera* hearing and properly instructed the jury regarding the purpose of the testimony, he alleges the court did not conduct a balancing test to determine if staleness outweighed probative value. The State contends the court properly determined the specific acts evidence was relevant to the character traits the appellant placed in evidence. The State argues that the court did not abuse its discretion by determining the evidence was probative and, therefore, admissible.

In his case in chief, the appellant presented the testimony of Mr. Kimble. The witness testified that the appellant is "an easygoing individual. Kind hearted. Loves animals. Would do anything, I think, to help anybody out that he could." He testified that over the past fifteen years, he had formed "a close relationship" with the appellant who babysat for his son on several occasions. When asked if he was "familiar with Rickey Carey's reputation in the community within which he lives for peaceableness[,]" he answered, "Yes, I mean, I feel that Rickey—I can't ever see him hurting anything." He continued to testify by stating:

Well, I have seen him many a time, the way he has taken care of animals and such. As to even one time a cat got run over, it wasn't his, he took it to the vet. He spent a lot of money to get that cat put back to health. I have seen him at the stores and stuff, and we go in, they was children and stuff in there, he would give them money to get them ice cream or candy or whatever. There has been many time he has lectured me on hunting because I am an avid hunter. "Why do you want to hunt? Why do you want to hurt anything? Why do you want to kill anything?" No, Rickey has always been very adamant about being peaceful.

Defense counsel finally asked, "And have you concluded what his reputation is with others with regard to peaceableness?" Mr. Kimble answered, "Yes. Nobody can believe this of Rickey. I mean, because it is not his nature."

At the close of direct testimony, the State requested a *Banjoman* hearing to determine if Rule 405(a) evidence [3] was admissible for cross-examination purposes. During the hearing, the State presented the testimony of Sergeant Brian Mason who produced the appellant's criminal record. Sergeant Mason testified that the appellant had two prior convictions, one in 1981 for making harassing telephone calls to a previous girlfriend and one in 1987 for joyriding. Defense counsel argued the convictions were stale. The court made the following ruling:

Thank you, counsel. The defense has put character for peacefulness and honesty in issue. The state has come up with two convictions, one that would be pertinent to

equally important, this practice upholds the integrity, dignity, and decorum of judicial proceedings.

3. West Virginia Rule of Evidence 405(a) states:

**Rule 405. Methods of proving character.**

(a) *Reputation or opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

the question of honesty because it does involve moral turpitude, even if it is joyriding, and the other one certainly relates to the question of peacefulness. The only possible issue is the fact that one of them at least is somewhat stale in time. But I think under Banjoman, the state has the right to ask the witness if he is aware of these things in framing his opinion. And he may say no, and he may say it doesn't change my opinion, but I think the state has the right to do that. But I think I also have to give the jury an instruction from the bench pursuant to Syllabus Point 5 of Banjoman which is once the Court determines that at the in camera hearing that the specific misconduct cross-examination of a character witness may proceed, the jury should be informed that its purpose is to test the credibility of the character witness, and it is not to be considered as bearing upon the defendant's guilt in the present trial.

Upon resuming the trial with the jury present, the court gave the following instruction:

Ladies and gentlemen of the jury, on direct examination this witness testified that he was familiar with the reputation of the defendant with regard to certain issues, and that he had an opinion with regard to certain character traits of the defendant. The attorney for the state now proposes to ask certain questions on cross-examination of this witness, as to certain alleged incidents in the defendant's past. I caution you that these questions will be permitted solely for the limited purpose of testing the testimony of this witness that he was familiar with the reputation of the defendant in the community. The answers to these questions are to be considered by you only for the purpose of testing the credibility of this witness. The questions and answers in this area are not to be considered as any evidence that the defendant committed the crime charged in this indictment.

When asked by the prosecutor if the fact that the defendant was convicted of making harassing telephone calls in 1981 would change his personal opinion, Mr. Kimble answered that it would not change his opinion and he was aware of the conviction. He also stated that it would not change his opinion as to the defendant's reputation in the community. When asked if he was aware of the defendant's conviction for joyriding, Mr. Kimble stated that he was not aware of the conviction but it did not change his opinion regarding whether the defendant was an honest man. Despite the conviction, he believed the community would view the defendant as an honest person.

Syllabus Points 4 and 5 of *State v. Banjoman*, 178 W.Va. 311, 359 S.E.2d 331 (1987), provide the procedure circuit courts must follow before specific instances of conduct may be used to impeach a character witness. These syllabus points read as follows:

The cross-examination of a defendant's character witnesses with regard to questions as to the witness's knowledge of specific instances of the defendant's misconduct is confined by certain limitations. There must initially be, by way of an *in camera* hearing, a disclosure of the proposed specific misconduct questions. The State must produce documents or witnesses from which the court may determine whether there is a good faith basis in fact that the misconduct actually occurred and would have been known to some degree in the community. A second limitation requires that the specific misconduct impeachment relate to facts which would bear upon the character traits that have been placed in issue by the character testimony on direct examination. Finally, the court must make the ultimate determination as to whether the probative value of the defendant's specific incident of misconduct, which is to be the subject of the cross-examination, outweighs its prejudicial value.

Once the court determines at the *in camera* hearing that the specific-misconduct cross-examination of a character witness may proceed, the jury should be informed that its purpose is to test the credibility of the character witness and it is not to be considered as bearing on the defendant's guilt in the present trial.

In this case, there is no question the misconduct occurred. Sergeant Mason testified that the appellant was convicted of joyriding and making harassing telephone calls. The convictions undoubtedly relate to honesty and peacefulness. The fact that the appellant was convicted for making harassing telephone calls to a prior girlfriend who no longer wished to be associated with him is obviously relevant to peacefulness and to the murder charge for which the appellant was on trial. Grand larceny auto which was reduced to joyriding obviously relates to honesty. Furthermore, the court explained the reasons the probative value of the convictions outweighed staleness and thoroughly instructed the jury on two occasions, at the time the evidence was offered and during the court's charge, regarding the purpose of the evidence.

■ " ' "Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Louk,* 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983).' Syllabus Point 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983)." Syllabus Point 1, *State v. Pettrey,* 209 W.Va. 449, 549 S.E.2d 323 (2001). We cannot say the circuit court abused its discretion by allowing the cross-examination.

### C. The Statement

■ The appellant contends that the statement he gave to police following his arrest should not have been played to the jury because it was given at a time when he was distraught. He believes the sleeping pills which he said he took approximately twelve hours earlier made the statement involuntary. He also believes ·he should have been presented to a magistrate before being taken to the police station.

During the hearing which the court held on October 25, 1999, the following conversation took place:

[THE PROSECUTOR]: Sort of a housekeeping matter, we would like to play the taped confession, and we have transcripts of the statement for the jury—to circulate to the jury so that they can follow the tape recording.

THE COURT: Any objection?

[DEFENSE COUNSEL]: Your Honor, I would object to the transcripts being given to the jurors. I don't have any problem with the taped statement. I was going to sort of make that suggestion myself.

■ This Court has frequently said, " ' "Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syl. pt. 1, *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964).' Syllabus point 1, *Estep v. Brewer,* 192 W.Va. 511, 453 S.E.2d 345 (1994)." Syllabus Point 2, *Maples v. West Virginia Dept. of Commerce,* 197 W.Va. 318, 475 S.E.2d 410 (1996). Also, "[a] litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal." Syllabus Point 1, *id.* Defense counsel not only did not object but stated that he was going to suggest that the court play the appellant's statement for the jury. The appellant cannot now complain that it was error for the jury to hear his statement. We find no merit in this contention of error.

### D. Jury Instructions

■ The appellant alleges the trial court erred by giving an improper inferred malice jury instruction; by not giving an involuntary manslaughter instruction; and by giving an incomplete cautionary instruction on the use of prior convictions. Each of these alleged errors will be addressed in turn.

The trial court's inferred malice instruction reads as follows:

The word malice as used in these instructions is used in a technical sense. It may be either express or implied. And it includes not only anger, hatred, and revenge, but other unjustifiable motives. It may be inferred or implied by you from all of the evidence in this case if you find such inference is reasonable from facts and circumstances in this case which have been proven to your satisfaction beyond all reasonable doubt. It may be inferred from

any deliberate and cruel act done by the defendant without any reasonable provocation or excuse, however sudden. Malice is not confined to ill will toward any one or more particular persons. But malice is every evil design in general, and by it is meant that the fact has been attended by such circumstances as are ordinarily symptoms of a wicked, depraved, and malignant spirit and carry with them the plain indications of a heart, regardless of social duty, fatally bent upon mischief. It is not necessary that malice must have existed for any particular length of time, and it may first come into existence at the time of the act or at any previous time.

The Court instructs the jury that homicide committed feloniously and unlawfully but without malice will constitute voluntary manslaughter. Malice, express or implied, is an essential element of murder in the first or second degree. And if absent, the homicide is of no higher grade than voluntary manslaughter. The Court instructs the jury that there is a permissible inference of fact that a person intends that which he or she does, or which is the immediate and necessary consequence of his or her act.

Malice and intent can be inferred by the jury from the defendant's use of a deadly weapon under circumstances which you do not believe afforded the defendant excuse, justification, or provocation for his conduct.

The appellant's entire argument states that the instruction would be constitutionally wrong if the word "presumed" had been used instead of "inferred" and when a court instructs a jury that they may infer something, that is "tantamount to the court giving an order for the jury to do that thing." Therefore, he says, "In this situation the 'request' of the court is in fact an order for the jury to do the thing that forms one of the elements of the case that the state is required to prove." The appellant points to no authority for this supposition.

The inferred malice instruction was discussed extensively by this Court in *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996). The instruction in that case stated:

The Court instructs the jury that in a prosecution for murder, if the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation, fired a deadly weapon in the direction where a person was located then from such circumstances it may be inferred that the defendant acted with malice and the intent to kill.

*Id.*, 197 W.Va. at 606, 476 S.E.2d at 553. The *Miller* Court found no error with the instruction because it did not supply by presumption any material element of the crime charged. The Court held as follows:

In instructing a jury as to the inference of malice, a trial court must prohibit the jury from finding any inference of malice from the use of a weapon until the jury is satisfied that the defendant did in fact use a deadly weapon. If the jury believes, however, there was legal justification, excuse, or provocation, the inference of malice does not arise and malice must be established beyond a reasonable doubt independently without the aid of the inference.

Syllabus Point 7, in part, *id.* Mr. Carey used not one, but two, deadly weapons to murder the victim. It was within the province of the jury to find or not to find justification, excuse, or provocation, and they found none. We find no error.

The appellant contends that an involuntary manslaughter instruction should have been given to the jury. He states that the jury should have been allowed to consider involuntary manslaughter because "[h]e was arguably, brandishing a dangerous or deadly weapon and unintentionally caused the death." By this he means that the first shot was fired after the victim struck the barrel of the gun. Even if that were the case, he offers no explanation for the four stab wounds or the shotgun blast to the head. The State believes the court properly refused the instruction.

This Court has said that "a trial court must give an instruction for a lesser included offense when evidence has been produced to support such a verdict." *State v. Stalnaker*, 167 W.Va. 225, 227, 279 S.E.2d

416, 417 (1981) (citation omitted). Furthermore,

> The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider,* 170 W.Va. 662, 295 S.E.2d 902 (1982).

Syllabus Point 1, *State v. Jones,* 174 W.Va. 700, 329 S.E.2d 65 (1985). It is well settled that involuntary manslaughter is a lesser included offense of murder. *See State v. Guthrie,* 194 W.Va. 657, 671, 461 S.E.2d 163, 177 (1995) ("The jury was charged in this case on the offenses of first and second degree murder and the lesser-included offenses of voluntary and involuntary manslaughter."). Thus, the inquiry focuses on whether evidence was presented at trial to support the appellant's request for an involuntary manslaughter instruction. "The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." Syllabus Point 7, *State v. Barker,* 128 W.Va. 744, 38 S.E.2d 346 (1946).

The appellant's defense at trial was that the shootings occurred accidentally and he did not remember inflicting the stab wounds. A review of the record proves conclusively that the knife was plunged deeply into the victim's abdomen not one, not two, but four times. The medical examiner testified that three of these stab wounds were lethal. This evidence was not challenged. The appellant did not even suggest that anyone other than himself inflicted these wounds. The appellant shot the victim in the chest and arm, proceeded to break down the shotgun and dispel the spent bullet, reload the gun, cock it, and shoot the victim a second time. This time he shot her in the head at close range. The medical examiner testified that both wounds were lethal and the head wound may have been a contact wound. This evidence was not challenged.

We find no lawful act. We find no evidence upon which the jury might have predicated a finding that the murder was unintentional. There is simply no credible argument that a death which results from the brutal delivery of three fatal stab wounds out of four and multiple shotgun blasts is accidental. The circuit court did not abuse its discretion by refusing to give an involuntary manslaughter instruction.

 Lastly, the appellant contends the trial court gave an incomplete cautionary instruction to the jury regarding the use of prior convictions. He believes the court erred by failing to add the dates the prior crimes were committed to the instruction. The court instructed the jury as follows:

> Those questions were asked if the witness really knew about the defendant's reputation for character and peacefulness and honesty. The information developed by the State's attorney on that subject may not be used by you for any other purpose. The possibility that the defendant may have committed these acts on an earlier occasion is not evidence that he committed the crime charged in this case.

Once again the appellant draws a blanket conclusion without offering any supporting law from this jurisdiction or any other jurisdiction. We know of none.

 The rule which must be followed when a witness is impeached with Rule 404(b) evidence is set forth in Syllabus Point 1 of *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994):

> When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

**664**

The court fulfilled this requirement twice, once when the testimony was offered and again in the court's charge to the jury. The court further reminded defense counsel that the dates were in evidence and could be argued to the jury. We find no error.

For the foregoing reasons, the judgment of the Circuit Court of Jefferson County is affirmed.

Affirmed.

ALBRIGHT, Justice, dissenting.

(Filed Dec. 11, 2001)

I respectfully dissent from the majority opinion because I firmly believe that the defendant was deprived of a fair trial by the introduction into evidence of the photograph depicting him barefoot and in shackles.

When presented with the analogous situation of a criminal defendant appearing at trial before a jury in prison attire, this Court said that such appearance communicates a condition of guilt to the jury and violates a fundamental tenet of our system of criminal justice—that an accused person is innocent until proven guilty. We also have recognized the substantial prejudice created against a criminal defendant by his appearance before a jury in physical restraints, and have concluded that it is only in extreme circumstances, when an accused poses an immediate threat to the security of the court room, that a trial court is justified in allowing such appearance. Notwithstanding these prior decisions, the majority somehow manages to find that these same principles do not apply to the admission of photographs depicting that which we find legally objectionable to occur "live"in the court room. I discern no difference. My belief is that the defendant in this case was robbed of the presumption of innocence by the admission of the photograph in question and thereby was denied a fair trial which constituted reversible error.

Additionally, I believe the majority is mistaken in its reliance on *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994) for its discussion of whether the jury was properly instructed regarding the use of the two prior convictions of the defendant, which were introduced by the State through cross-examination of the defendant's character witness,

for the sole purpose of testing the credibility of the witness. I agree that the instruction given by the lower court was correct, but not under the standard set forth in *McGinnis* but under the controlling case of *State v. Banjoman*, 178 W.Va. 311, 359 S.E.2d 331 (1987). *McGinnis* governs the jury instruction to be given when evidence is introduced pursuant to Rule 404(b) of the Rules of Evidence. *Banjoman*, on the other hand, addresses the jury instruction to be given when prior convictions of the defendant are raised during cross-examination of a character witness under Rule 405(a) of the Rules of Evidence. While both of these rules deal in some fashion with the subject of character evidence, the procedures to be followed under each are not interchangeable either within the language of these rules or in our case law regarding them.

The conviction should have been reversed and new trial ordered.

I am authorized to state that Justice STARCHER joins in this dissent.